267 S.E.2d 108 (1980)
Paul S. JAMES
v.
John A. JANE, M. D. and Hans O. Riddervold, M. D.
David L. LAWRENCE
v.
Michael W. HAKALA, Jr., M. D.
Record Nos. 780413, 780450.
Supreme Court of Virginia.
June 6, 1980.
Thomas E. Albro, Charlottesville (Tremblay & Smith, Charlottesville, on briefs), for appellants.
Jack B. Russell, Richmond (Kimberly T. Henry, Browder, Russell, Little, Morris & Butcher, Richmond, on brief), for appellees.
The Association of Trial Lawyers of America (James A. Eichner, Richmond, on brief), amicus curiae, for appellants.
Before I'ANSON, C. J., and CARRICO, HARRISON, COCHRAN, POFF and COMPTON, JJ.
HARRISON, Justice.
Paul S. James sought to recover from Dr. John A. Jane and Dr. Hans O. Riddervold damages for personal injuries resulting from the alleged negligent acts of the defendants in connection with a myelogram performed on plaintiff while he was under their care during 1974.
David L. Lawrence sought to recover from Dr. Michael W. Hakala, Jr., damages for personal injuries resulting from the alleged negligent acts of the defendant in connection with an operation performed on him while he was under the care of Dr. Hakala during 1975.
*109 All defendants filed pleas of immunity in response to the respective motions for judgment filed by James and Lawrence. The court below sustained the plea in each case. The plaintiffs have been awarded appeals, and the cases have been consolidated, the issues involved being identical.
The defendants are licensed to practice medicine, and each is a full-time member of the faculty of the Medical School of the University of Virginia. Dr. Jane was Chairman of the Department of Neurosurgery at the Medical School and Chief of Neurosurgery at the University of Virginia Hospital during the time of the alleged negligence. Dr. Riddervold was an Associate Professor of Radiology at the Medical School and a member of the hospital staff in the Radiology Department. Dr. Hakala was an Assistant Professor of Orthopedic Surgery and Rehabilitation, an Assistant Professor of Pediatrics in the Medical School, and an attending staff physician at the hospital.
The Medical School is one part of the University's Medical Center, which is composed of the Hospital, the Medical School and the Nursing School. The Center is under the supervision of the Vice President for Health Sciences, who in turn is under the authority of the President of the University. The President of the University has ultimate responsibility to the Rector and Board of Visitors, an agency of the Commonwealth of Virginia. Admittedly, the Medical Center, and in turn the Hospital, are agencies of the Commonwealth of Virginia.
The basic responsibilities of faculty members of the Medical School are teaching, research, and patient care. Dr. Jane as a department chairman, has the additional administrative responsibility of that office. All faculty members are members of the hospital staff, whose teaching responsibility includes supervision of residents, medical students, and nursing students. The defendants, as full-time faculty members, were not permitted to engage in the practice of medicine individually or outside the Medical Center unless it was done during their one month vacation period. The defendants' only compensation as faculty members was a fixed annual salary which covered their teaching responsibility and services rendered in patient care as Medical Center physicians. The compensation received by any particular physician was determined by the Dean of the Medical School upon recommendation of the chairman of the department to which the attending physician and faculty member was assigned. The ceiling for salaries of faculty members in the Medical Center is fixed by the Governor of Virginia and is determined by the academic rank of the individual.
The budget of the Medical School is approved by the Vice President for Health Sciences, by the President of the University of Virginia, and ultimately by the Rector and Board of Visitors. The salaries of faculty members are paid from the Medical School's budget which is prepared by the Dean and encompasses the entire operation of the Medical School as well as compensation for faculty members. The three defendants involved here receive no compensation for patient care other than their respective salaries from the University of Virginia. The amount of a faculty member's salary is determined at the beginning of each year, and this sum is paid to the faculty member involved regardless of the amount of money this physician earns for his particular department, or the amount of money earned by his department through fees for patient care.
The Medical Center's funds are derived largely from state appropriations made by the General Assembly, training and research grants, and revenue received from the professional care rendered patients by the faculty attending staff physicians. To facilitate the handling of revenues from patient care, the Clinic-Private Division (CPD) unit of the Medical Center was created. When a patient enters the hospital, a determination is made as to his financial responsibility. If a patient has insurance, or is otherwise financially able to pay, he is classified as a private patient. If he has no insurance and is unable to pay, he enters *110 the hospital as a "staff patient." The state has established indigency standards, and those who do not meet that standard are admitted as private patients, charged directly for professional services rendered by a member of the attending staff, and billed through the CPD rather than through the hospital.
Witnesses testified that once a patient is admitted to the hospital, whether private or staff, the patient receives identical treatment and services. No member of the medical staff may refuse to see a patient because of his classification. Dr. Hakala testified that there was no difference in the treatment of private patients and staff patients, and that a staff patient has the right to request and receive the care of a particular attending physician. It was also testified, however, that the attending physicians have the privilege to select the patients they will treat and are under no obligation to accept any individual or class of persons as patients. Residents and interns in training do not enjoy this privilege. Rather, they have the duty to treat any patient who is assigned to them for treatment.
While all attending physicians are required and encouraged to follow certain guidelines to the end that their professional services constitute "good medical practice," the attending physicians of patients exercise broad discretion in selecting the methods by which they care for them. Although an attending physician may consult with colleagues, the final decisions as to diagnosis and treatment are his or her own.
The classification of patients appears to be utilized primarily as a billing device. Almost every patient is taken care of by a member of the house staff, as well as by an attending physician, and this is true whether a patient is staff or private. Dr. Jane testified with reference to surgical duties and said that such duties are divided between the residents and the attending staff physicians. Specifically he said that the division was such that one month he might have the primary responsibility for doing the surgery with the help of his senior resident, and the next month the surgery would be done by the senior resident with his help. He said the rule applied to both staff and private patients.
It appears that although treatment received by staff and private patients is identical, private patients receive two bills, one from the hospital and one from the attending physician through the CPD billing system, whereas staff patients only receive a bill from the hospital. The money received from bills sent by the hospital is turned over to the Bursar of the University and is used to fund the hospital. The money received through the CPD bills from private patients is applied to payment of the total operating expenses of the Medical School. While the records of the Bursar reflect the amount of money generated by each of the CPD departments, and the individual physician's charges, receipts, and receivables, none of the funds received from the patients come directly back to any individual faculty member or to his respective department. The budget of the CPD is operated entirely from the fees received from private patients. In 1974, five and one-half percent (5½%) was withheld to fund the CPD budget. Ten percent (10%) of total collections each month is allocated to a fund used in partial support of the attending physicians' (faculty members) retirement program in which the physicians become entitled to participate. The remaining CPD funds become a part of the Medical School's general budget which includes salaries for faculty physicians and staff members, supplies, and miscellaneous operating expenses. The amount of time spent in patient care by a faculty member varies greatly, and some physician-faculty members participate little in patient care, a fact which does not affect the amount of their compensation from the University.
Each department in the CPD formulates a schedule of fees for the various procedures performed by its attending physicians, and this is approved by a policy committee made up of elected department representatives. While the attending physicians seldom are involved in the collection process, in some instances when the fees are *111 not paid, they are asked to recommend or decide on the final disposition of collection, and are privileged to compromise their bills or forgive them. All bills are sent in the name of the attending physician. It is noted that the physicians at the University of Virginia Clinic-Private Division are not required to purchase local revenue licenses in connection with their practices.
The respective allegations of negligence made in their motions for judgment by plaintiffs James and Lawrence are not important to our decision here. It suffices to say that James was referred to Dr. Jane by his family physician in Waynesboro, Virginia, for diagnosis and treatment of cervical spinal pain, and he was accepted as a private patient in the Department of Neurosurgery at the University of Virginia Clinic-Private Division, where a myelogram was performed on him by Dr. Riddervold. Lawrence, also a private patient, suffered a knee injury. He was taken to the emergency room of the University Hospital where he was first seen by the residents then on duty. Dr. Hakala, the staff physician on call at the time, talked on the phone with the residents on duty and concluded that Lawrence's injury required surgery. Lawrence was admitted to the University Hospital as a private patient in the Department of Orthopedic Surgery at the University of Virginia Clinic-Private Division, and was operated on the following morning by another doctor, with Dr. Hakala present.
The position of the plaintiffs is that as fully licensed physicians, Doctors Jane and Riddervold and Dr. Hakala are independent contractors who select the manner in which they treat their own patients. They argue that the physicians do not act as agents or servants of the Commonwealth under instructions from superiors. Rather, they say the physicians act individually and under their own responsibility and that under such circumstances the doctrine of sovereign immunity does not insulate them from liability for their own negligence.
The defendants respond that at the time they treated James and Lawrence they were members of the faculty of the University of Virginia Medical School and physicians on the attending staff of its hospital, and thus were employees and agents of the Commonwealth of Virginia, their employer and principal. They contend that in treating James and Lawrence they were performing a discretionary act within the scope of their employment and that because the General Assembly has not consented to this action in tort against the state, they, as state employees, are entitled to the protection of the immunity of the state.
Defendants also argue that they are salaried employees of a state medical school and that as a part of their duties they attend and treat patients in a state hospital. They rely strongly upon the fact that they do not receive compensation from the patients they treat. And they also point to the chain of command of the Medical Center and contend that they are under the control of, answerable to, and directed by their "superiors," who are also state employees.
The University Hospital is an integral and essential part of the University's Medical Center. A medical school could not operate without a hospital as an adjunct thereto. Students learn in the classrooms and laboratories and by observing and assisting in the care and treatment of patients. Most certainly it is contemplated by both parties that a physician employed by the University to teach in the Medical School will also practice his specialty as an attending physician in, and as a member of the staff of, the University Hospital. His duties are two-fold. He will teach, and he will also attend patients, usually in the presence of and assisted by students, interns, and residents in the University Hospital. The University provides the administration staff, the physical facilities, operating rooms, interns, residents, and nurses. It places him in a hospital where numerous patients come for medical and surgical attention with the knowledge that the physician will see and attend both private and staff patients. Implicit in this arrangement is the understanding that the physician will use reasonable care in the performance of his duties as such an attending physician.
*112 At the point when the physician agrees to treat or operate on a certain patient, although his employment by the University makes possible the arrangement, the relationship becomes the personal and confidential one of doctor and patient, not the Commonwealth of Virginia and patient. The physician owes his best professional efforts on behalf of the patient, and the patient expects, and has a right to expect, the same care and attention from the physician that he would receive if he were in a private hospital and the physician in private practice. The exercise by the attending physician of his professional skill and judgment in treating his patient, and the means and methods used, from the very nature of things, are not subject to the control and direction of others. The fact that the physician may follow certain prescribed guidelines and consult with colleagues, or that a review may be conducted when a patient is injured, or when a patient dies, does not alter the professional status of the attending physician or his relationship with and obligation to his patient.
The University of Virginia is controlled by "the Rector and Visitors of the University of Virginia," a public corporation created for that purpose. Code § 23-69. It is not a party defendant, and no one questions the fact that this agency of the Commonwealth of Virginia is entitled to the protection of the immunity of the state. The issue here is whether the defendants are entitled to claim the same immunity in an action in tort against them for their alleged failure to exercise reasonable care in treating the plaintiffs.
We make a distinction between the sovereign Commonwealth of Virginia and its employees, and a governmental agency created by the Commonwealth, and its employees. And we have specifically held that the latter do not enjoy governmental immunity and are answerable for their own acts of simple negligence. Short v. Griffitts, 220 Va. 53, 255 S.E.2d 479 (1979), Crabbe v. School Board and Albrite, 209 Va. 356, 164 S.E.2d 639 (1968), and Kellam v. School Board, 202 Va. 252, 117 S.E.2d 96 (1960).
In Sayers v. Bullar, 180 Va. 222, 22 S.E.2d 9 (1942), we were called upon for the first time to pass judgment upon a case where employees of the state were sued for a tort arising from work being done by them for the state. There, an action was brought by a landowner to recover damages sustained as a result of explosives set off by two employees of the state during the construction of a pipeline for the state and on the state's property. The plaintiff claimed that as a result a spring on his property ceased to flow. The court found that the acts of the defendants were the acts of the state and that there were no facts alleged that the employees had stepped beyond the course of their employment, had exceeded their authority or directions given them, were guilty of any wrongful conduct or acted wantonly or negligently, or were acting individually or on their own responsibility. We found that the defendants were acting "solely in their representative capacity as lawful and proper agents of the State and not in their own individual right." Id. at 229, 22 S.E.2d at 12. We further observed that "[i]t would be an unwise policy to permit agents and employees of the State to be sued in their personal capacity for acts done by them at the express direction of the State, unless they depart from that direction." Id. And we recognized that a state employee may be liable for his conduct while performing work for the state if his conduct is wrongful or if his performance is so negligent as to take him outside the protection of his employment.
In Elder v. Holland, 208 Va. 15, 155 S.E.2d 369 (1967), Elder brought an action for common law defamation and under the insulting-words statute. Holland filed a plea asserting his immunity from liability for the defamatory words he allegedly spoke, claiming that he spoke them in the scope of his official duties as a member of the Virginia Department of State Police, and that as an agent of the state he was protected by the state's immunity from tort liability. We reviewed the several cases in which we have held or recognized that a state employee may be liable for his conduct while performing work for the state if *113 his conduct is wrongful. Consistent with these cases, and having concluded that under certain conditions a state employee may be held liable for his negligent conduct, we held a state employee may be held liable for an intentional tort. We found Holland was therefore not immune from liability for defamatory words spoken while performing his duties as a state police officer.
In Lawhorne v. Harlan, 214 Va. 405, 200 S.E.2d 569 (1973), we held that the chief administrator and the assistant administrator of the University of Virginia Hospital, and Pulito, the surgical intern involved, were entitled to the sovereign immunity enjoyed by the Commonwealth of Virginia. The administrators were exercising discretionary powers in the performance of their duties. The intern was a salaried employee of the University of Virginia and subject to the direction and control of his employer. We noted that the intern also exercised discretionary judgment in treating those persons who presented themselves as patients at the emergency room, had no contractual relationship with the hospital's patients, received no compensation from the patients for his services performed within the scope of his employment, and did not act independently as far as any patient was concerned or involved.
The Commonwealth of Virginia functions only through its elected and appointed officials and its employees. If because of the threat of litigation, or for any other reason, they cannot act, or refuse to act, the state also ceases to act. Although a valid reason exists for state employee immunity, the argument for such immunity does not have the same strength it had in past years. This is because of the intrusion of government into areas formerly private, and because of the thousand-fold increase in the number of government employees. We find no justification for treating a present day government employee as absolutely immune from tort liability, just as if he were an employee of an eighteenth century sovereign. It is proper that a distinction be made between the state, whose immunity is absolute unless waived, and the employees and officials of the state, whose immunity is qualified, depending upon the function they perform and the manner of performance. Certain state officials and state employees must of necessity enjoy immunity in the performance of their duties. These officers are inclusive of, but not limited to, the Governor, state officials, and judges. They are required by the Constitution and by general law to exercise broad discretionary powers, often involving both the determination and implementation of state policy.
Admittedly, no single all-inclusive rule can be enunciated or applied in determining entitlement to sovereign immunity. In Elder v. Holland, supra, there was a wanton and intentional deviation by a state employee from his assigned duties and therefore a loss by him of his qualified immunity. In Sayers v. Bullar, supra, there was no such wrongful deviation and no loss. A state employee who acts wantonly, or in a culpable or grossly negligent manner, is not protected. And neither is the employee who acts beyond the scope of his employment, who exceeds his authority and discretion, and who acts individually.
The difficulty in application comes when a state employee is charged with simple negligence, a failure to use ordinary or reasonable care in the performance of some duty, and then claims the immunity of the state. Under such circumstances we examine the function this employee was performing and the extent of the state's interest and involvement in that function. Whether the act performed involves the use of judgment and discretion is a consideration, but it is not always determinative. Virtually every act performed by a person involves the exercise of some discretion. Of equal importance is the degree of control and direction exercised by the state over the employee whose negligence is involved. In Sayers the control by the employer was absolute, and the discretion by the employees was minimal. In Lawhorne the state's interest and involvement were great, and all defendants were afforded immunity, but for widely divergent reasons. The administrators *114 were executive officers charged with the operation of a vast hospital complex. The state's interest demanded that they exercise wide discretionary powers and be accorded immunity. The intern, although equally as essential to the operation of the hospital as the administrators, was, because of his inexperience, closely controlled, supervised, and directed by his employer. Indeed, an intern is prohibited by statute, Code § 54-276.7, from rendering medical services except under the supervision of a licensed member of the hospital staff to whom he is responsible and accountable at all times. The state's interest and the circumstances and conditions of the intern's employment required that he be afforded immunity.
In the case under review the paramount interest of the Commonwealth of Virginia is that the University of Virginia operate a good medical school and that it be staffed with efficient and competent administrators and professors. The state is of course interested and concerned that patients who are treated at the University Hospital receive proper medical care. However, the state has this same concern for every patient who is treated in any private hospital or by any doctor throughout the Commonwealth. This is evidenced by the numerous statutes enacted by the General Assembly of Virginia designed to assure adequate medical care and medical facilities for the people of the state. The state's interest and the state's involvement, in its sovereign capacity, in the treatment of a specific patient by an attending physician in the University Hospital are slight; equally slight is the control exercised by the state over the physician in the treatment accorded that patient. This interest and involvement is not of such moment and value to the Commonwealth as to entitle Doctors Jane, Riddervold, and Hakala to the immunity enjoyed by the state.
While there may have been a time when a physician was attracted to teach in a state medical school, and to serve as an attending physician on the staff of its hospital, because of the cloak of immunity afforded him as an employee of the sovereign state, we think that time is past. We cannot conceive of any physician, regardless of his status, practicing medicine in this era without the protection of liability insurance, which he purchases for himself or which is provided for him by his employer. Realistically, the only interest the state has in affording immunity to the physicians practicing in state hospitals is the probability of an increase in the cost of medical malpractice insurance if such immunity is denied. We do not find this to be such a compelling state interest as to justify the denial of a patient the right to assert a claim against a physician for negligent treatment.
The only issue we decide here is whether a physician, employed by an agency of the Commonwealth of Virginia and practicing in a hospital operated by such an agency, should be immune from an action for his negligence, i. e., for his failure to exercise reasonable care in attending a patient. In Eriksen v. Anderson, 195 Va. 655, 660-61, 79 S.E.2d 597, 600 (1954), we said: "There is no statute which authorizes the officers or agents of the State to commit wrongful acts. On the contrary, they are under the legal obligation and duty to confine their acts to those which they are authorized by law to perform. If they exceed their authority, or violate their duty, they act at their own risk, ... and the State is not responsible or liable therefor." As we have heretofore observed, implicit in the employment by the University of Virginia of physicians to teach in its Medical School and to attend patients in its Hospital, is the understanding that they will use reasonable care in the performance of their duties. A failure to use such care in the treatment of patients is a violation of their duty to the patients and a departure from a condition of their employment. A physician who fails to use reasonable care in the treatment of a patient acts at his own risk, and is not entitled to invoke the doctrine of sovereign immunity.
For the reasons assigned, we hold that the court below erred in sustaining the pleas of immunity filed by the defendants.
Reversed and remanded.
COCHRAN and POFF, JJ., concurring.
*115 COCHRAN, Justice, concurring.
I agree with the result reached by the majority opinion. However, for reasons expressed in my dissent in Lawhorne v. Harlan, 214 Va. 405, 408-09, 200 S.E.2d 569, 572-73 (1973), I believe that Lawhorne is inconsistent with Crabbe v. School Board and Albrite, 209 Va. 356, 164 S.E.2d 639 (1968), is unsound, and should be forth-rightly overruled rather than distinguished to extinction.
The majority opinion attempts, unsuccessfully in my view, to distinguish between full-time members of the faculty of the University of Virginia Medical School, held not to be immune from liability for negligence in the present case, and the hospital administrators and the surgical intern of the same institution, held to be immune in Lawhorne. Negligence is negligence  want of such care and caution as an ordinarily prudent and reasonable man would have exercised under the same circumstances. Agents and employees of an immune employer who fail to meet the reasonable man test are negligent and should be held liable for their negligent acts that proximately cause injury to others.
Therefore, I would overrule Lawhorne, so that the judiciary and the bar will understand that the principles approved in Crabbe will be followed in Virginia as they are in the majority of other jurisdictions. The uncertainty arising from hair-splitting distinctions will then give way to a sound, logical, and certain rule of general application.
POFF, J., joins in the concurring opinion.