## CIRCUIT COURT OF LEE COUNTY

MFC Partnership and
Paul-Van Apparel Corp.

v.

Phillip Foster et al.

July 16, 1986

By JUDGE WILLIAM C. FUGATE

*Re Motion to Set Aside the Verdict*

This action arose out of an incident occurring on July 10, 1981, in which the plaintiff sustained property damage when dynamite was detonated during an attempt by defendant, Phillip Foster, to dispose of it by burning.

The salient facts are as follows. Phillip Foster was employed by the Commonwealth of Virginia, Department of State Police, as Assistant to the Special Agent in charge, Bureau of Criminal Investigation. He had been so employed since July, 1978. Prior to that time he held a position with the same responsibilities with the Virginia State Corporation Commission.

In addition to special police training, Mr. Foster trained in explosive disposal at the Redstone Missile and Munitions Center in Huntsville, Alabama, while employed with the Virginia State Corporation Commission. He also had periodic retraining in bomb and explosives disposal and had been involved in the disposal of explosives on many occasions prior to the time in question.

On July 10, 1981, the Lee County Sheriff's Office dispatcher asked Mr. Foster to assist Estes Brothers, Inc., in disposing of some old dynamite. After examining the material, Mr. Foster and a subordinate, Special Agent Paul Davidson planned to dispose of the dynamite by burning it. Foster took complete charge of and made all decisions with respect to disposal of the dynamite.

Foster moved the explosives to a field and, after certain preparations, set them afire. Unexpectedly, the dynamite detonated, causing an explosion. Foster's disposal of the explosives was pursuant to the standing directions of his superiors to dispose of explosives at the requests of citizens as part of his employment with the State Police.

Originally, there were two defendants, Mr. Foster and Colonel D. M. Slane, then the Superintendent of the Virginia State Police. Ruling upon defendants' special pleas of sovereign immunity, the Court, granted the plea with respect to Colonel Slane, but denied it as to Mr. Foster. The case was tried by a jury beginning January 8, 1986. The jury found for the plaintiff and fixed damages at $48,000.00. The case is now before the Court on defendant's motion to set aside the verdict and enter judgment for defendant or grant a new trial.

Defendant contends that as an employee of the Virginia State Police, a Department of the Commonwealth of Virginia, he is entitled to the shield of the cloak of sovereign immunity granted unto the Commonwealth from liability. Defendant asserts that in handling the explosives he was exercising judgment and discretion and was acting in a supervisory capacity. Plaintiff contends that the defendant is not immune from liability under prevailing case law, asserting that defendant is not a supervisory employee of the State and that he was exercising ministerial functions, not discretionary.

Since the claims herein arose prior to July 1, 1982, the Court is not concerned with the Virginia Tort Claim Act, Code §§ 8.01-195.1 to 8.01-195.8, which waives governmental immunity in limited situations.

The status of the doctrine of sovereign immunity is constantly changing, resulting in much uncertainty among the bench and bar. See, the dissents in *Lawhorne v. Harlan*, 214 Va. 405, 408-409 (1973); *Banks v. Sellers*, 224 Va. 168, 174-175 (1982); *Bowers v. Comm.*, 225 Va. 245, 254-255 (1983); *Hinchey v. Ogden*, 226 Va. 234, 242-243

(1983); *Messina v. Burden*, 228 Va. 301, 316-318 (1984); and the concurring opinion of Mr. Justice Cochran in *James v. Jane*, 221 Va. 43, 55-56 (1980). In *Messina*, the Court re-examined the law of sovereign immunity in the Commonwealth and attempted to lay down a rule of sovereign immunity which could reconcile previous decisions. However, in his dissent, Justice Cochran again expresses his consternation at what he views to be irreconcilable opinions in the law of sovereign immunity, at page 316. In his dissenting opinion in *Banks*, Justice Cochran felt the majority opinion could not be reconciled with previous cases, leaving "bench and bar with no consistent rule or pattern to follow," at p. 174. "This tendency of the majority to tiptoe around the fringes of sovereign immunity not only produces highly attenuated reasoning but leads to increasing uncertainty and confusion in the trial courts." *Bowers*, at p. 255. In light of recent legislative enactments and judicial decisions, a survey of recent developments of the doctrine of sovereign immunity is needed to resolve the issues presented.

The Virginia common law doctrine of sovereign immunity distinguishes between which agencies and employees enjoy immunity and which do not. In *James*, at p. 51, the Supreme Court of Virginia stated, "[w]e make a distinction between the Sovereign Commonwealth of Virginia and its employees, and local governmental agencies and their employees. And we have specifically held that the latter do not enjoy governmental immunity and are answerable for their own acts of simple negligence." This same distinction was clearly drawn by the Court in *Short v. Griffitts*, 220 Va. 53, 55 (1979), where the school athletic director, baseball coach and buildings and grounds supervisors were held not immune from liability for their simple acts of negligence because they were "employees of. . . a local governmental agency whom we have specifically held do not enjoy governmental immunity and who are answerable for their own acts of negligence." With this distinction in mind, the cases become more reconcilable, although application of the legal principles and the balancing of factors in a given situation will necessitate close adherence to the significant factors which the Supreme Court has enunciated.

Equally important is the nature of the immunity which the sovereign, its agencies and employees enjoy. The sovereign Commonwealth and its agencies enjoy absolute

immunity from liability unless waived or abrogated by Statute. Certain state offices and state employees, such as the Governor, state officials and judges appear to enjoy the absolute immunity of the sovereign for their official acts, subject to limited exception. However, as to other employees of the state or her agencies, the immunity is qualified, depending upon the functions they perform and the manner of performance. "The Commonwealth of Virginia functions only through its elected and appointed officials and its employees. If because of the threat of litigation, or for any other reason, they cannot act, or refuse to act, the state also ceases to act. Although a valid reason exists for state employee immunity, the argument for such immunity does not have the same strength it has in past years. This is because of the intrusion of government into areas formerly private, and because of the thousandfold increase in the number of government employees. We find no justification for treating a present day government employee as absolutely immune from tort liability, just as if he were an employee of an eighteenth century sovereign. It is proper that a distinction be made between the state, whose immunity is absolute unless waived, and the employees and officials of the state, whose immunity is qualified, depending upon the function they perform and the manner of performance." *James*, at p. 52-53.

Three decisions appear to be the basis of current controversy: *Crabbe v. School Board*, 209 Va. 356 (1968); *Short v. Griffitts, supra* (1979); and *James v. Jane, supra* (1980). In each of these cases an individual employee was held not to be immune from liability for his own individual acts of negligence committed in his employment. The dissenting opinion in *Lawhorne* (in which the Court granted immunity to a surgical intern at U. Va. hospital) urges that *Crabbe* (which held a teacher not entitled to immunity for power saw injury to student) established that an individual government employee is not immune for his own acts of simple negligence, at 408-9. After *Short* in 1979 (where no immunity was extended to athletic director, baseball coach and grounds keeper for injury to a student falling on track) and *James* in 1980 (where no immunity was granted to doctors who were full-time employees of U. Va. hospital), the dissenting opinions in *Banks, Bowers*, and *Hinchey* (all cases in which individual employees were held immune for simple acts of negli-

gence) contend that the rule established in *Crabbe, Short*, and *James* was that a negligent employee of an immune employer is liable for his own negligence and that the individual tortfeasor cannot cloak himself with the immunity of the state or his employer for his own acts of simple negligence. *Crabbe* and *Short* are decided on the same, legal principles, however, *James* falls within that category of cases to which a qualified immunity may exist, depending upon the circumstances. Both the *Crabbe* and *Short* decisions were reached on the basis that employees of a local governmental agency, created by the state, "do not enjoy governmental immunity and are answerable for their own acts of simple negligence." *James*, at 51. In *James*, however, the Court stated that the defendant doctors, who were full-time staff employees at U. Va. hospital, were state employees and were within the class of employees that may be cloaked with the immunity of the sovereign-employer depending on the circumstances. Through the balancing of the significant factors of the "function. . . [the employee] performs and the manner of performance," *James* at 53, the Court concluded that the qualified privilege should not be extended to the doctors. Thus, to determine whether no immunity exits or whether a qualified immunity may exist, the employee must first be classified as state or local in those cases involving simple negligence. However, it is unnecessary to dwell upon such classification as to the defendant here because Foster, an employee of the Department of State Police, would be considered a state employee, for reasons considered in *Elder v. Holland*, 208 Va. 15 (1967). See *Rives v. Bolling*, 180 Va. 124 (1942), which held a state police officer to be a state employee.

Having determined that the defendant falls within the classification of state employees who may be entitled to a qualified governmental immunity, we must next consider the factors to be applied in determining whether the facts at bar warrant the granting of immunity to the defendant. In *James*, the Virginia Supreme Court enumerated those factors to be considered in determining how the lines of immunity should be drawn.

> [W]hen a state employee is charged with simple negligence, a failure to use ordinary or reasonable care in the performance of some duty, and then claims the immunity of the state.

> . we examine (1) the functions this employee was performing and (2) the extent of the state's interest and involvement in that function. . . (3) the use of judgment and discretion . . . , [which is] not always determinative. . . (4) degree of control and discretion exercised by the state over the employee whose negligence is involved. at 53.

Of course, upon any balancing of factors the weight or significance given any particular set of circumstances will govern the granting or withholding of immunity, but such balancing may account for the decisions viewed by some as inconsistent or irreconcilable in such cases as *James, Lawhorne, Crabbe, Short,* and *Banks.*

With this background, we next turn to the defendant who has pled sovereign immunity and those factors to be considered in denying or extending immunity. The Virginia State Police was established in 1942 as a separate Department of the Commonwealth and is headed by the Superintendent. Michie's Code 1942, § 585(71a). The Bureau of Criminal Investigation was statutorily required to be a division within the Department. The functions of the Department are enumerated in § 52-4 of the Code (1950, as amended). The powers and duties of the Bureau of Criminal Investigation are delineated in § 52-8.1 of the Code (1950), as amended. Phillip Foster is a special agent in the Bureau of Criminal Investigation.

The handling, storage and use of explosives is regulated by statute and rules and regulations promulgated by the Safety and Health Codes Commission. Section 40.1-23 of the Code (1950) provides, *inter alia:*

> (b). . . such rules and regulations shall, insofar as practicable, be based upon the recommendations of recognized bodies in the field of demolition and explosives, and generally recognized bodies in the field of safety in the use of explosives and blasting agents which have promulgated standards for the protection of the public in such cases. Rules and regulations adopted by the Safety and Health Codes Commission pursuant to this section shall be enforceable by the Commissioner and by all

officers empowered to enforce the criminal law of the state.

    (d) Any person violating any such rule or regulation shall be guilty of a misdemeanor.

Any person engaged in the manufacture, storage, handling, use or sale of explosives or blasting agents is required to obtain a permit from the Department of Labor and Industry. § 40.1-25 of the Code. § 52-8.1 of the Code (1950, as amended) provides, *inter alia*:

> The Bureau [of Criminal Investigation] may, in all other [other than Class 1, 2 or 3 felony] requests for investigations made by. . . any sheriff. . . conduct an investigation into the subject matter so requested, to determine whether criminal violations have occurred, are occurring or are about to occur.

By applying the balancing factors of *James*, the Court is of the opinion that immunity should not be granted to the defendant, Phillip Foster, for his alleged tortious acts under the circumstances of the case. Foster is a special agent of the Bureau of Criminal Investigation of the Department of State Police. His duties include the destruction of old or deteriorating explosives when requested to do so. In this instance the request came from the dispatcher of the Lee County Sheriff's Department. Foster attempted to destroy the explosives by burning rather than by detonation and the procedures followed by him were intended to adhere to techniques for which he had received training in disposal procedures, including a proper and safe location for destruction. However, by his own testimony at trial, Foster did not adhere to the recommended procedures for destruction of deteriorated dynamite. Foster testified that in order to desensitize nitroglycerin crystals that may be present on deteriorated dynamite, the dynamite should be soaked in diesel fuel, "if possible, for as long a period as you can, up to twenty-four hours." (at transcript page 26) Yet, the dynamite was in fact soaked only "[a]pproximately three to four hours." (at transcript page 10 and page 45) When asked why the dynamite was not soaked for twenty-four hours, Foster responded, "We had people going to be out here the next day, the next morning, there was

not a twenty-four hour period to do it." (at transcript p. 45) But, previously, in his testimony, Foster acknowledged that there was a twenty-two hour period from the time of his arrival on the scene at 12:00 p.m. until the time of the scheduled sale at 10:00 a.m. the next morning. (at transcript p. 43) In regard to transporting the dynamite from one location to another, Foster stated, "You minimize the movement whenever possible." (at transcript p. 43) Yet he testified that he moved the trailer that the dynamite was in "approximately forty or fifty foot away from the building and back out to where we unloaded it." (transcript at p. 44). Foster acknowledged that the Division had a "bomb tank," specially designed to transport explosives which could have been available to him, but that he did not call for the truck. (transcript at pp. 41-43)

While destruction of explosives which may be illegally or improperly stored is a function that may be within the power of the Department of State Police, it is not exclusively a governmental function and is probably more usually performed by the private sector. Admittedly, public safety is a proper area of governmental involvement, but, on balance, the private interest that such hazardous undertaking be done without damage or injury to members of the public is of equal, if not more importance, than the state's employee being permitted to act with impunity. While the performance of every duty involves a certain degree of judgment and discretion, Foster's destruction of the explosives was primarily ministerial requiring adherence to established guidelines and procedures. By dictum, *Berry v. Hamman*, 203 Va. 596, 598 (1982), held that a police officer could be personally liable for negligent acts in the performance of a ministerial duty. Foster, in actually performing his duty, did not operate under the direct control and supervision of a superior who was on the scene to monitor his performance, as was the case with the surgical intern in *Lawhorne*; to the contrary, he had no direct supervision in the performance of the ministerial act but only indirect control from his superior. Yet, in his training he had been instructed as to specific procedures to follow when handling explosives. In summary, Foster was not acting in a supervisory capacity when he carried out his duties of disposing of the explosives. His duties were primarily ministerial involving little or no discretion. The state's interest

and involvement, in its sovereign capacity, in the destruction of dynamite is not as of great importance under the facts of this case as the counterbalancing interest of the rights of individual citizens to have a right to sue for damage from a hazardous undertaking. To deny an injured member of the public the right to seek redress for his damage under the aegis that the state's interest in public safety immunizes its employees from liability for a wrongful act defies reason and results in an injustice to the public. Here, the involvement of the state is not as great as its involvement in education (*Crabbe* and *Banks*), or in highway maintenance and construction (*Bowers* and *Hinchey*) or in state supported education (*Lawhorne* and *Messina*).

The Virginia Supreme Court's most recent opinion concerning the doctrine of sovereign immunity came down in 1984 in *Messina.* There, the Court once again used the supervisory duties versus ministerial duties approach to determine that the defendant, Burden, was immune from liability under the doctrine of sovereign immunity. The Court also reaffirmed the *James* test, and using that balancing test found defendant Armstrong also immune from liability. In *Ausley v. Mitchell,* the United States Court of Appeals for the Fourth Circuit, per Judge Widener, noted in a footnote that "[e]ven if Virginia law may not be 'certain'. . . as to the immunity of state employees for the negligent performance of discretionary acts, it is certain that state employees negligently performing ministerial acts are not entitled to immunity." 748 F.2d 224, 226, fn. 2 (4th Cir. 1984). In the Court's opinion, the defendant negligently performed ministerial acts and for the reasons set forth above should not be entitled to the defense of sovereign immunity.

Defendant contends that the Court erred in sustaining plaintiff's objection to questions propounded by defendant's counsel pertaining to the cost of repairing the building and in granting instruction 12, which reads:

Where real property is damaged, the measure of damages is the difference in value immediately before and immediately after the explosion, taking into account only damages which resulted from the defendant's acts.

Defendant asserts that the proper measure of damages should be the lesser of diminution in market value or reasonable cost of repair. To support his position, defendant cites *Averett v. Shircliff*, 218 Va. 202 (1977). *Averett*, however, involved the negligent damage to an automobile, which is personal property. The case at bar involves negligent damage to improvements to real property. Diminution in market value is the proper measure of damages for real property when such value can be reasonably ascertained. See *Douthat v. C. & O. Railway Co.*, 182 Va. 811, 817 (1944); *Younger v. APCO*, 214 Va. 662, 664 (1974); Michie's Jurisprudence, Vol. 53, page 79-80, § 32. It is the Court's opinion that no error was committed in granting Instruction No. 12, and likewise, there was no error in sustaining plaintiff's objection to defendant's question regarding the cost of repairing the building.

Defendant's final contention is that the Court erred in sustaining plaintiff's objection and in striking the testimony of defendant in which he attempted to explain why he took certain actions. Plaintiff's counsel objected to the defendant's testimony of "possibilities," stating the defendant should testify as to "probabilities," not "possibilities." The Court sustained the objection. (transcript at pp. 53-54)

The admissibility of conclusions or opinions of either nonexpert or expert witnesses is primarily a matter in the discretion of the trial Court. Am. Jur. 2d, Vol. 31, *Expert and Opinion Evidence*, § 3, p. 497. See also Michie's Jurisprudence, Vol. 7, *Evidence*, § 170, p. 562. Further, opinion evidence as to "possibilities" is generally inadmissible. "A mere supposition of a witness as to what would have happened if something had occurred which did not, or something had not occurred which did, or whether a certain thing could have happened under certain circumstances, which the witness says did not exist will, ordinarily, be rejected as involving too large an element of conjecture." *id.*, § 179 at 585. See *Davis v. Souder*, 134 Va. 356, 362 (1922). It is the opinion of this Court that defendant's testimony as to the "possibilities" would involve too much conjecture. Thus, plaintiff's objection to such testimony was properly sustained. The defendant contends in his second grounds to set aside the verdict the plaintiff failed to prove a prima facie case of negligence and failed to prove a prima facie case of cause in fact. It is the Court's position that

the conclusions hereby above set forth and the record in this case gives no basis for the Court to give serious consideration to this ground and that the plaintiff's evidence sustains his position. For the foregoing reasons, defendant's motion to set aside the verdict and enter judgment for the defendant or grant a new trial is denied.