PRESENT: All the Justices

SENTARA MEDICAL GROUP

v. Record No. 250671

JAMES W. KLENA, M.D., ET AL.

OPINION BY
JUSTICE WESLEY G. RUSSELL, JR.
FEBRUARY 26, 2026

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Tasha D. Scott, Judge

Sentara Medical Group ("Sentara") appeals from a judgment of the circuit court

sustaining the plea of sovereign immunity filed by Chesapeake Regional Medical Group

("CRMG") in response to Sentara's claim that CRMG tortiously interfered with Sentara's

employment agreement with a physician. For the reasons that follow, we conclude that the

circuit court erred in sustaining CRMG's plea of sovereign immunity and remand the matter for

further proceedings consistent with this opinion.

I. BACKGROUND[1]

A. The Chesapeake Hospital Authority and CRMG

In 1966, the General Assembly created the Chesapeake Hospital Authority (the

"Authority") as "a public body politic and corporate[.]" 1966 Acts ch. 271, § 1. The 1966

legislation provided that "[t]he Authority shall be deemed to be a public instrumentality,

exercising public and essential governmental functions to provide for the public health and

welfare[.]" *Id.* § 3. In 1987, the General Assembly expanded the Authority's purpose,

---

[1] In the proceedings below, no evidentiary hearing was held because CRMG elected to pursue its plea of sovereign immunity by relying on the allegations in Sentara's complaint. As a result, we treat the facts alleged in the complaint as true. *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019). In this scenario, we also "grant the plaintiff the benefit of all reasonable factual inferences that can be drawn from such a view of the facts." *Montalla, LLC v. Commonwealth*, 303 Va. 150, 164 (2024) (internal quotation marks and citation omitted). Our recitation of the facts is consistent with these principles.

empowering it "to provide for the public health, welfare, convenience and prosperity of the residents of the City of Chesapeake and such other persons who might be served by the Authority . . . and to provide improved medical care and related services to such residents and persons[.]" 1987 Acts ch. 396, § 3.

In pursuit of its purposes, the Authority was authorized to "plan, design, construct, remove, enlarge, equip, maintain and operate hospital and medical facilities . . . and to do all things necessary and convenient to carry out any of its purposes." 1966 Acts ch. 271, § 4. From the record, it appears that, at least initially, the Authority pursued these purposes by operating a hospital, Chesapeake General Hospital, which now does business as Chesapeake Regional Medical Center, an entity distinct from CRMG.

Over time, the activities and purposes that the Authority was allowed to pursue expanded. For example, in 1987, the Authority was empowered to operate a wide variety of health care facilities in addition to a hospital, including, but not limited to, nursing homes, continuing care facilities, hospices, and substance abuse facilities. 1987 Acts ch. 396, § 4. To facilitate these projects, the Authority was also empowered to operate "supporting facilities and equipment necessary and desirable in connection therewith or incidental thereto," to include "parking facilities, kitchen, laundry, laboratory, pharmaceutical, administrative, communications, computer and recreational facilities and equipment, storage space, mobile medical facilities, vehicles and other equipment necessary or desirable for the transportation of medical equipment or the transportation of patients." *Id.*

As time progressed, the Authority was granted additional powers to undertake all manner of activities to "carry out the purposes and intent of" the act creating the Authority. 1987 Acts ch. 396, § 7.1. By way of example, the Authority was empowered "[t]o promote, develop,

2

improve and increase the commerce and economic development of the City of Chesapeake and its environs." 1987 Acts ch. 396, § 7.1(2). Most pertinent to this appeal, the Authority was authorized

> [t]o assist in or provide for the creation of domestic or foreign stock and nonstock corporations, limited liability companies, partnerships, limited partnerships, associations, foundations or other supporting organizations or other entities, and to purchase, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, shares of or other interests in, or obligations of, any domestic or foreign stock and nonstock corporations, limited liability companies, partnerships, limited partnerships, associations, foundations or other supporting organizations, joint ventures or other entities organized for any purpose, or direct or indirect obligations of the United States, or of any other government, state, territory, governmental district or municipality or of any other obligations of any domestic or foreign stock or nonstock corporation, limited liability company, partnership, limited partnership, association, foundation or other supporting organization, joint venture or other entity organized for any purpose or any individual. The investment of funds held by the Authority, or contributed to its affiliated foundations, shall be exempt from the application of the Investment of Public Funds Act, Chapter 45 (§ 2.2-4500 et seq.) of Title 2.2 of the Code of Virginia. The investments of any entity wholly owned or controlled by the Authority that is an "institution," as such term is defined in § 55-268.12, shall be governed by the Uniform Prudent Management of Institutional Funds Act (§ 55-268.11 et seq.) of the Code of Virginia.

1987 Acts ch. 396, § 7.1(3) (as amended by 2019 Acts chs. 249, 250; 2006 Acts ch. 658). The Authority was further empowered to provide to any such corporate "entities owned in whole or in part or controlled, directly or indirectly, in whole or in part, by the Authority with appropriate assistance, including making loans and providing time of employees, in carrying out any activities authorized by this act." 1987 Acts ch. 396, § 7.1(4). Additionally, the Authority was empowered "[t]o transact its business, locate its offices and control, directly or through domestic or foreign stock and nonstock corporations, limited liability companies, partnerships, limited

partnerships, associations, foundations or other supporting organizations, joint ventures or other entities, facilities that will assist or aid the Authority" in pursuing the objectives of its enabling legislation. 1987 Acts ch. 396, § 7.1(7) (as amended by 2006 Acts ch. 658).

The Authority also has been exempted from certain provisions of Virginia law that often apply to governmental entities. In addition to the exemption from the Investment of Public Funds Act referenced in § 7.1(3) above, the Authority was granted certain exemptions from VFOIA and the Virginia Public Procurement Act. *See* 1990 Acts ch. 419, § 7.2; 1998 Acts ch. 697, § 7.3.

At some unspecified point in time, the Authority created CRMG, a Virginia nonstock corporation, as a subsidiary. The record is silent as to when CRMG was formed, its corporate structure, its governance, the specifics of its relationship with the Authority beyond it being a subsidiary, and whether the city council of the City of Chesapeake has any role in the operations of CRMG. The record does reflect that CRMG employs at least some physicians who work at Chesapeake Regional Medical Center, the hospital owned and operated by the Authority, and that, at the relevant time, the same person served as President and CEO of both CRMG and Chesapeake Regional Medical Center. The record reveals no other material facts about CRMG, its creation, function, or operations.

B. The dispute between Sentara and CRMG

Sentara is a Virginia non-stock corporation and is a subsidiary of Sentara Health. Sentara Health "owns and operates hospitals in the Hampton Roads region, including Sentara Norfolk General Hospital . . . and Sentara Virginia Beach General Hospital[.]" In turn, Sentara employs at least some of the physicians who practice at Sentara Health's facilities, including Norfolk General Hospital and Virginia Beach General Hospital.

4

Dr. James Klena[2] is a cardiovascular surgeon who was employed by Sentara. Dr. Klena began working for Sentara in December 2022 when he signed an Employment Agreement ("Agreement") with the company. The Agreement included several restrictive covenants, including a noncompete clause prohibiting Dr. Klena from "render[ing] medical services as a Physician in Physician's Specialty to, for, or on behalf of a Competing Health Care Organization or Competing Medical Group" within a "25 mile geographic radius surrounding any Facility or office location at which Physician performed Significant Services during the twelve calendar month period immediately preceding Physician's cessation of employment." The restriction applies for a one-year period "commencing on the effective date of termination of this Agreement."

While working for Sentara, Dr. Klena worked out of Norfolk General and Virginia Beach General hospitals. In May 2024, Sentara employees learned that Dr. Klena was planning on accepting a position with one of Sentara's competitors, CRMG. If the rumor proved true, he would work at Chesapeake Regional Medical Center, an Authority-owned hospital within the 25-mile radii of both Norfolk General and Virginia Beach General.

After learning about Dr. Klena's impending defection, Sentara sent him a letter warning him that accepting employment with CRMG would violate the terms of the Agreement, specifically its prohibition against "accepting employment at a competing healthcare system for one year following the end of [his] employment with [Sentara]." The letter, and its transmittal

[2] In the brief of the appellees filed in this Court, counsel for CRMG and Dr. Klena informed the Court that "[d]uring the pendency of this appeal, Dr. Klena actually resigned from his position with CRMG and signed a new employment agreement with Sentara. Pursuant to the terms of the agreement, all claims as between Dr. Klena and Sentara will be dismissed and released once the stay currently in place in the circuit court is lifted. Sentara has not agreed to dismiss its claims against CRMG."

email, copied various Chesapeake Regional Medical Center employees, including its President and CEO. As noted above, the President and CEO of Chesapeake Regional Medical Center was the same person who served as President and CEO of CRMG.

Sentara never received responses to its letters. After Dr. Klena's employment with Sentara ended on June 17, 2024, he began working for CRMG. When Sentara learned of Dr. Klena's employment with CRMG, it filed suit.

Specifically, Sentara sued Dr. Klena for breaching his employment contract and sued CRMG for tortiously interfering with its contract with Dr. Klena. In response, CRMG filed a plea of sovereign immunity. The essence of CRMG's argument before the circuit court was that, because the Authority is entitled to the protection of sovereign immunity and the Authority created CRMG as a subsidiary, CRMG shares in the Authority's entitlement to immunity as a matter of law. For its part, Sentara did not and does not challenge the Authority's immunity, but rather, argued and argues that CRMG does not share in the Authority's immunity.

After hearing the parties' arguments, but taking no evidence, the circuit court issued an opinion letter granting the plea in bar and dismissing the action against CRMG with prejudice. In doing so, the circuit court essentially adopted CRMG's argument that, as a subsidiary of the Authority created by the Authority, CRMG shared in the Authority's immunity from suit.

Sentara timely petitioned to this Court pursuant to Code §§ 8.01-626 and 8.01-670.2 seeking review of the circuit court's immunity ruling. We granted the petition and now address Sentara's challenge to the circuit court's judgment.

6

## II.  ANALYSIS

### A.  Standard of review

Because the circuit court heard no evidence in support of CRMG's plea of sovereign immunity, we "consider solely the pleadings in resolving the issue presented." *Fines v. Rappahannock Area Cmty. Servs. Bd.*, 301 Va. 305, 312 (2022) (citation omitted).  In doing so, "we accept as true all facts alleged in [Sentara's] complaint" and grant Sentara "the benefit of all reasonable factual inferences that can be drawn from such a view of the facts." *Montalla, LLC v. Commonwealth*, 303 Va. 150, 164 (2024) (internal quotation marks and citations omitted). "With the facts and inferences viewed in this manner, we conduct a de novo review of whether" the circuit court correctly sustained CRMG's plea of sovereign immunity.  *Id.* (citing *Plofchan v. Plofchan*, 299 Va. 534, 547-48 (2021)).

### B.  Sovereign immunity

In Virginia the doctrine of sovereign immunity represents "a rule of social policy, which protects the state from burdensome interference with the performance of its governmental functions and preserves its control over state funds, property, and instrumentalities." *City of Chesapeake v. Cunningham*, 268 Va. 624, 633 (2004) (quoting *City of Virginia Beach v. Carmichael Dev. Co.*, 259 Va. 493, 499 (2000)).  The doctrine generally has been accepted as "an established principle of sovereignty" that precludes the Commonwealth from being "sued in its own courts . . . without its consent and permission." *Gray v. Virginia Secy. of Transp.*, 276 Va. 93, 101 (2008) (quoting *Board of Public Works v. Gannt*, 76 Va. 455, 461 (1882)).

"Absent an express statutory or constitutional provision waiving sovereign immunity, the Commonwealth and its agencies are immune from liability for the tortious acts or omissions of their agents and employees." *Rector & Visitors of the Univ. of Va. v. Carter*, 267 Va. 242, 244

(2004). The protections of the doctrine are not just enjoyed by the Commonwealth and its agencies, but can also apply to other governmental entities and agents. For example, "[c]ounties, as political subdivisions of the Commonwealth, enjoy the same tort immunity" as does the Commonwealth. *Seabolt v. County of Albemarle*, 283 Va. 717, 719 (2012) (citing *Mann v. County Bd. of Arlington County*, 199 Va. 169, 175 (1957); *Fry v. County of Albemarle*, 86 Va. 195, 197-99 (1890)).

Although not the absolute blanket of protection afforded to the Commonwealth, its agencies, and counties, sovereign immunity, in certain circumstances, provides protection to other entities. Municipal corporations enjoy the protections of sovereign immunity "from tort liability arising from [their performance of] governmental functions, but not proprietary functions." *Massenburg v. City of Petersburg*, 298 Va. 212, 218 (2019). Such protections apply whether the municipal corporation is a city, *id.*, or another type of municipal corporation. *See, e.g.*, *Carter v. Chesterfield Cnty. Health Comm'n*, 259 Va. 588, 590 (2000) (citing *Virginia Elec. and Power Co. v. Hampton Redevelopment and Housing Authority*, 217 Va. 30, 33 (1976); *Hampton Roads Sanitation Dist. Com. v. Smith*, 193 Va. 371, 377 (1952)).

The protections of sovereign immunity can, in certain circumstances, extend to agents and employees of immune entities. In *James v. Jane*, 221 Va. 43, 55 (1980), we held that an attending physician at the University of Virginia Hospital, who we assumed was an employee of the Commonwealth, was not entitled to the protections of sovereign immunity for a claim of medical negligence. In doing so, we did not endorse the idea that individual state employees are never entitled to the protections of sovereign immunity. Rather, we held that the entitlement to immunity will depend on the specific facts and circumstances because, unlike the Commonwealth which enjoys "absolute" immunity, an employee is, at most, entitled to

8

"qualified" immunity. *Id*. at 53. We then specified the factors a court should consider in determining whether a state employee is entitled to immunity, noting that a court must:

> examine the function this employee was performing and the extent of the state's interest and involvement in that function. Whether the act performed involves the use of judgment and discretion is a consideration, but it is not always determinative. Virtually every act performed by a person involves the exercise of some discretion. Of equal importance is the degree of control and direction exercised by the state over the employee whose negligence is involved.

*Id*.

We have since applied what has been colloquially referred to as *James*' four-part test to non-state employees, holding that "[i]f an individual works for an immune governmental entity then, in a proper case, that individual will be eligible for the protection" of sovereign immunity. *Messina v. Burden*, 228 Va. 301, 312 (1984). We reiterated that, in determining whether such an employee was entitled to the protection of sovereign immunity, a court should consider:

> 1. the nature of the function performed by the employee;
>
> 2. the extent of the [immune entity's] interest and involvement in the function;
>
> 3. the degree of control and direction exercised by the [immune entity] over the employee; and
>
> 4. whether the act complained of involved the use of judgment and discretion.

*Id*. at 313.

Taken together, these cases establish a sliding scale of sovereign immunity from the "absolute" immunity of the Commonwealth and its agencies to the "qualified" immunity of other entities, agents, and employees. The fact that a municipal corporation was either chartered or created by the General Assembly does not automatically entitle that entity to the protections of

9

sovereign immunity; rather, such an entity is only entitled to the protection of sovereign immunity if it is engaged in a governmental function. *Massenburg*, 298 Va. at 218; *Carter*, 259 Va. at 590. In general, agents and employees of immune entities, whether the Commonwealth, one of its agencies, a county, or a municipal corporation, do not automatically share in the protection of sovereign immunity enjoyed by their principal, but rather, are only entitled to immunity if they meet the *James* four-part test. *James*, 221 Va. at 53; *Messina*, 228 Va. at 313. In effect, the further away a person or entity is from the sovereign, the less likely it is that the person or entity will be entitled to immunity, and the entitlement to immunity, if any, for agents and employees necessarily will depend on the specific facts and circumstances.

C. Immunity of the Authority and the potential of derivative immunity for CRMG

The parties agree that, in general, the Authority is entitled to the protections of sovereign immunity. In its briefing in this Court, Sentara expressly assumes that the Authority is a municipal corporation entitled to sovereign immunity when performing governmental functions. The disagreement is whether CRMG automatically shares in the Authority's immunity. That is, does CRMG enjoy derivative immunity as a result of being a subsidiary of the Authority?

CRMG's position below and its position on appeal is that because the Authority is immune for its performance of governmental functions and was authorized by its enabling act to create an entity such as CRMG, CRMG necessarily shares in its immunity. As the above-cited authorities make clear, an agent of an immune entity does not automatically share in the immunity of the entity. Rather, an agent or employee of an immune entity only is entitled to the protections of immunity if he, she, or it can establish that entitlement under the factors specified

10

in our prior cases.[3]  Accordingly, we must reject CRMG's argument that it necessarily shares in the Authority's immunity, and, to the extent that the circuit court adopted that reasoning, the circuit court erred.

This conclusion, however, does not lead us to adopt a position advanced by Sentara—that CRMG could never share in the Authority's immunity and can only be immune if, independent of the Authority, CRMG qualifies as either an agency of the Commonwealth or a municipal corporation.  Such an extreme view cannot be squared with our prior cases finding that agents or employees of immune entities can be entitled to share in the immunity of their principal.  *James*, 221 Va. at 53; *Messina*, 228 Va. at 313.  After all, such an individual agent or employee is not the Commonwealth, an agency of the Commonwealth, a county, or a municipal corporation, yet the agent or employee may be entitled to share in the protections that sovereign immunity affords the immune entity for which the agent or employee works.  The same can be true for corporate agents such as CRMG; the question is how to determine when a corporate agent shares in the immunity enjoyed by its principal.

---

[3] That the Authority's enabling statute allows it to create and utilize entities like CRMG does not change the analysis.  The Commonwealth is certainly authorized to and necessarily does hire employees to carry out its legitimate functions.  *Cf. James*, 221 Va. at 52 ("The Commonwealth of Virginia functions only through its elected and appointed officials and its employees.").  Yet such employees are not automatically entitled to share in the Commonwealth's immunity.  *Id*. at 53.  Furthermore, given all of the things that the Authority's enabling act authorizes it to do, adopting CRMG's argument would expand the scope of sovereign immunity beyond anything we previously have decided.  After all, the Authority is authorized to "acquire, own, [and] hold . . . shares of or other interests in, or obligations of, any domestic or foreign stock and nonstock corporations, limited liability companies, partnerships, limited partnerships, associations, foundations or other supporting organizations, joint ventures or other entities organized for any purpose[.]"  1987 Acts ch. 396, § 7.1(3) (as amended by 2019 Acts chs. 249, 250; 2006 Acts ch. 658).  Taking CRMG's position to its logical conclusion seemingly would entitle any entity in which the Authority acquired an interest to the protections of sovereign immunity.  The doctrine simply does not stretch that far.

11

Our prior cases dealing with the question of whether an agent shares in the immunity enjoyed by his or her principal have dealt with individual employees as opposed to corporate agents. In fact, neither party has identified a prior decision of this Court that directly addresses how to determine when a corporate agent, as opposed to an individual, is entitled to share in the immunity of a principal. Both parties, however, rely on and cite to a circuit court opinion, *Stevens v. Hospital Auth. of the City of Petersburg*, 45 Va. Cir. 162, 1998 Va. Cir. LEXIS 70 (Cir. Ct. City of Richmond 1998), written by then-circuit court judge Donald W. Lemons that directly addressed the issue.

In *Stevens*, a plaintiff brought a negligence action against the Hospital Authority of the City of Petersburg d/b/a Southside Regional Medical Center ("Southside Regional") and numerous other individual and corporate defendants who were either employees of Southside Regional or had contracted with Southside Regional to provide services related to the operation of the hospital. 45 Va. Cir. at 163, 165, 166. Having previously found that Southside Regional was entitled to immunity as a municipal corporation, *id.* at 162, then-Judge Lemons held that, to be entitled to share in Southside Regional's immunity, the remaining employee and corporate "defendants claiming sovereign immunity must meet the four-prong test articulated by the Supreme Court of Virginia in *James v. Jane*, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980)." *Id.* at 163. To make such determinations, the circuit court held a multi-day evidentiary hearing to examine the relationship of each of the corporate agents to Southside Regional and how the various corporate structures and contractual relationships fit into the *James* framework. *Id.*

Although we reiterate that "no single all-inclusive rule can be enunciated or applied in determining [the] entitlement to sovereign immunity" of individual or corporate agents of immune entities, *James*, 221 Va. at 53, we believe the use of the *James* framework by then-Judge

12

Lemons is an appropriate starting point for determining whether a corporate agent shares in the immunity of its principal. Although the test was formulated to address the status of individuals, it provides at least a framework for making the determination regarding corporate agents as well.

We stress that the determination requires a review of all of the facts and circumstances and rarely will a single factor or circumstance prove dispositive. In conducting this totality of the circumstances review, the nature and structure of the corporate agent; its relationship with the immune entity; the degree of control the immune entity or other governmental actor exerts over the corporate agent; and whether the corporate agent was necessary or merely convenient to the performance of a governmental function if the immune entity is a municipal corporation all will be relevant, albeit non-dispositive, considerations. Furthermore, the type of claim asserted will also color the analysis because a corporate agent that "acts beyond the scope of" its agency and "exceeds [its] authority and discretion" is not entitled to share in the immunity of its principal. *Id*. at 53.

D. Application to CRMG in this case

It is possible that sufficient facts and circumstances exist to establish that CRMG generally is entitled to share in the Authority's immunity; however, the record before us does not reveal those facts and circumstances. Because CRMG elected not to put on evidence and relied on the allegations of Sentara's complaint, we do not have sufficient information to determine whether CRMG is entitled to immunity in this case. Although we know that CRMG is a subsidiary created by the Authority, that it shared a President and CEO with Chesapeake Regional Medical Center, and that it employed at least some of the physicians who provide services at Chesapeake Regional Medical Center, we know nothing else about its creation, how it

13

operates, or the degree of control exercised by the Authority or another government entity over its composition, functions, and operations.

In the absence of such evidence, it is impossible for any court to determine whether or not CRMG is immune from Sentara's claim against it. Because CRMG bore the burden of proving its entitlement to immunity, *see Whitley v. Commonwealth*, 260 Va. 482, 493 (2000), the circuit court erred in sustaining CRMG's plea of sovereign immunity.

## III. CONCLUSION

For the foregoing reasons, the circuit court erred in sustaining CRMG's plea of sovereign immunity. Accordingly, we reverse the judgment of the circuit court and remand the matter for further proceedings consistent with this opinion.

*Reversed and remanded*.