# CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

Crystal Ann MacArthur et al.

v.

University of Virginia
Health Services Foundation

December 8, 2006

Case No. CL04-154

BY JUDGE RANDY I. BELLOWS

The present motion before the Court is the Defendant's, University of Virginia Health Services Foundation ("HSF"), Special Plea of Charitable Immunity. Both parties have fully briefed the issue. The Court heard oral argument on this matter on September 21, 2006. After consideration of the briefs, oral argument, applicable case law, and the transcript from the September 21, 2006, hearing, the issue is ripe for decision. For the reasons stated below, the defendant's Special Plea of Charitable Immunity is sustained.

*Factual Background*

The present litigation concerns events which occurred at the University of Virginia Hospital ("UVA Hospital") on July 30, 2002, involving the care received by plaintiff, Crystal Ann MacArthur. Plaintiff contends that, on that

day, she arrived at UVA Hospital suffering from decreased vision and diminished and impaired coordination. After being diagnosed with a right occipital ventriculoperitoneal shunt malfunction, the plaintiff was admitted to UVA Hospital. The plaintiff maintains that the defendant negligently failed to deliver timely the proper surgical care to address the plaintiff's shunt malfunction, ultimately resulting in the plaintiff's permanent vision loss and blindness.

On July 29, 2004, the plaintiff filed the instant complaint charging the defendant with negligence. Neither UVA Hospital nor the individual doctors who rendered care to the plaintiff were sued. On April 26, 2006, the defendant filed the Special Plea of Charitable Immunity now before the Court.

*Summary of Parties' Positions*

The defendant relies principally on *Ola v. YMCA of South Hampton Roads, Inc.*, 270 Va. 550 (2005), and asserts: (1) that HSF's articles of incorporation include a charitable purpose; (2) that HSF operates in accordance with this charitable purpose; and (3) that the plaintiff was a beneficiary of HSF's charitable services. Defendant's Brief in Support of its Special Plea 5. Therefore, argues HSF, it is immune from liability in the instant litigation under the doctrine of charitable immunity.

The plaintiff makes several arguments in opposition to the special plea of charitable immunity.

First, the plaintiff asserts that Va. Code Ann. § 8.01-38 (2006) prevents HSF from availing itself of charitable immunity. Va. Code Ann. § 8.01-38 denies charitable immunity to a hospital unless the hospital either provides all of its patient services free of charge or the hospital enters into a written express agreement with a patient in which the hospital agrees not to bill or charge the patient for medical treatment or services. The plaintiff asserts that HSF is a hospital as that term is used in the statute and, therefore, HSF must be denied charitable immunity. Even if HSF is not deemed to be a hospital, plaintiff contends that it is still subject to the provisions of Va. Code Ann. § 8.01-38 because HSF is a supporting entity for a hospital.

Second, the plaintiff asserts that if HSF is not covered by Va. Code Ann. § 8.01-38, it is still not entitled to charitable immunity because it does not qualify for such immunity under *Ola*. The plaintiff contends that HSF's articles of incorporation do not state a charitable purpose, but, rather, state scientific and educational purposes. Moreover, the plaintiff argues that "HSF's affiliation with the University of Virginia is to provide medical services, not charity." Plaintiff's Brief in Opposition (hereinafter "Pl.'s Opp.") 7. For this

reason alone, asserts the plaintiff, HSF is not entitled to charitable immunity. Finally, the plaintiff argues that, even if HSF was organized as a charity, it does not actually operate as one and, therefore, HSF is not entitled to charitable immunity.

*Discussion*

A. *Va. Code Ann. § 8.01-38 does not apply to HSF*

The plaintiff maintains that HSF is a hospital[1] and as such is denied charitable immunity under Va. Code Ann. § 8.01-38 (2006). The Court concludes, however, that HSF is not a hospital under the statute and, therefore, the statute is inapplicable to the instant case.

Va. Code Ann. § 8.01-38 states in part as follows:

> No hospital, as defined in this section, shall be immune from liability for negligence or any other tort on the ground that it is a charitable institution unless (i) such hospital renders exclusively charitable medical services for which service no bill for service is rendered to, nor any charge is ever made to the patient or (ii) the party alleging such negligence or other tort was accepted as a patient by such institution under an express written agreement executed by the hospital and delivered at the time of admission to the patient or the person admitting such patient providing that all medical services furnished such patient are to be supplied on a charitable basis without financial liability to the patient.

Va. Code Ann. § 8.01-38 defines a hospital as "any institution within the definition of hospital in § 32.1-123." According to Va. Code Ann. § 32.1-123 (2006), a hospital is:

> any *facility* licensed pursuant to this article in which the primary function is the provision of diagnosis, of treatment, and of medical and nursing services, surgical or nonsurgical, for two or more nonrelated individuals, including hospitals known by varying nomenclature or designation such as sanatoriums,

---

[1] Pl.'s Opp. 5 (claiming that "HSF is clearly a 'hospital' under Va. Code Ann. § 8.01-38").

sanitariums and general, acute, rehabilitation, chronic disease, short-term, long-term, outpatient surgical, and inpatient or outpatient maternity hospitals.

(Emphasis added.)

HSF is not a facility. Rather, HSF is the entity that employs the physicians who care for patients at UVA Hospital. The fact that HSF owns and operates several clinics in outlying areas does not change the Court's analysis. Transcript of September 21, 2006, Hearing on Charitable Immunity on ("9/21 Hearing") 147. Plaintiff argues, in effect, that this is a distinction without a difference on the theory that what gives a hospital its special significance is not its bricks and mortar or its CAT scan machines or its operating theaters, but rather the physicians who use the facility and its equipment to render patient care. It is these physicians who ultimately make a hospital the place where illness is cured and suffering ameliorated. The Court does not disagree with the proposition that a medical facility without doctors cannot accomplish the mission of a hospital. The Court does, however, disagree with the proposition that this means that a hospital and its doctors are synonymous and interchangeable. The Court notes that Mr. William Carter, HSF former Chief Executive Officer from 1980 until 1998, testified that HSF has never applied for a license to operate as a hospital, HSF has never actually held a license to operate as a hospital, and HSF has never been the subject of any type of hospital accreditation. 9/21 Hearing 111.

Va. Code Ann. § 8.01-38 could certainly have been written to cover health care providers such as doctors. Instead, it covers "hospitals" only, i.e., medical facilities. When a statute is in derogation of the common law, it must be "strictly construed and not be enlarged in [its] operation by construction beyond [its] express terms." *Schwartz v. Brownlee*, 253 Va. 159, 166 (1997) (citations omitted). Here, the plaintiff asks this Court to enlarge the statute to redefine hospitals as both medical facilities and the health care providers who work in them, even where such providers are not hospital employees. This the Court cannot do. The Court might take a different view if there was any evidence in the record to suggest that HSF was formed to take advantage of charitable immunity and to avoid the reach of Va. Code Ann. § 8.01-38. The best evidence that this was not the case is that HSF was formed in 1980 but only recently sought a finding of charitable immunity. See 9/21 Hearing 91, 93, 222-23.

The plaintiff's alternative argument regarding Va. Code Ann. § 8.01-38 is no more persuasive. Plaintiff argues that HSF is a supporting organization for UVA Hospital and, if UVA Hospital can not avail itself of charitable

immunity, neither can any entity that supports it. 9/21 Hearing 212-13. According to the plaintiff, HSF "stands in the shoes" of UVA Hospital, Pl.'s Opp. 4, and cannot avail itself of charitable immunity if the hospital cannot avail itself of charitable immunity. Even under this theory, however, Va. Code Ann. § 8.01-38 does not apply to HSF. There is no suggestion in Va. Code Ann. § 8.01-38 that its reach encompasses both hospitals and their supporting organizations. Rather, the statute unambiguously states that "no hospital, as defined in this section, shall be immune from negligence." As stated earlier, a statute in derogation of the common law must be strictly construed. Va. Code Ann. § 8.01-38 covers hospitals only, and this Court cannot interpret the statute to extend its reach to those organizations that provide support for hospitals.

B. *Applicability of Ola v. YMCA of South Hampton Roads, Inc., 270 Va. 550 (2005)*

One cannot address the issue of charitable immunity without being mindful of the fact that at least five different circuit courts have thus far addressed this issue either in connection with HSF or in connection with a similar entity, Eastern Virginia Medical School Academic Physicians and Surgeons Health Services Foundation. There is, however, no unanimity of opinion. The Circuit Court of the City of Charlottesville decided against a finding of charitable immunity in two cases involving HSF, *Morris et al. v. UVA, HSF,* ■ and *Reid v. Jane*. The Fourth Judicial Circuit in Norfolk, in *Kremen, etc. v. Bon-Secours-DePaul Med. Ctr., etc.* and in *Mullen, etc., et al. v. Dattel et al.*, and the Third Judicial Circuit in Portsmouth, in *Moore et al. v. Maryview Med. Ctr., etc. et al.*, 71 Va. Cir. 442 (2005), have both sustained pleas of charitable immunity entered by a defendant foundation similar to HSF. Moreover, there is no appellate court decision specifically addressing the issue of the applicability of *Ola* to a health services foundation. *Mullen* was appealed to the Supreme Court of Virginia, and the petition for appeal was denied. Defendant argues that the denial elevates the circuit court's decision to statewide precedent. Plaintiff argues that the petition's denial has no precedential significance. Plaintiff is correct. Although a denial of a petition for appeal is a decision on the merits, see, i.e., *Sheets v. Castle*, 263 Va. 407, 412 (2002), it only has precedential value if the basis for refusing the appeal is discernible from the "four corners" of the court's order. *Id.* In this case, the

denial of appeal reads as follows: "[u]pon review of the record in this case and consideration of the argument submitted in support of and in opposition to the granting of appeal, the Court is of the opinion there is no reversible error in the judgment complained of. Accordingly, the Court refuses petition for appeal." Thus, the basis of the Court's decision is not discernible from the "four corners" of the court's order. Hence, it cannot be read as constituting a decision by the Supreme Court of Virginia upholding a finding of charitable immunity in a case involving a similar health services foundation. Nevertheless, the Court's analytical mission is clear. It must determine whether HSF qualifies for charitable immunity based on *Ola* and other cases that have established the principles governing charitable immunity in Virginia. *Ola* is only the most recent iteration of Virginia's charitable immunity law. Principles of charitable immunity date back as far as 1921. See, e.g., *Weston's Adm'x v. Hospital of St. Vincent*, 131 Va. 587 (1921).

In *Ola*, the Supreme Court of Virginia evaluated the issue of whether charitable immunity should apply to a local YMCA and reached the conclusion that the defendant YMCA should enjoy charitable immunity. Specifically at issue in *Ola* was the defendant's special plea of charitable immunity and the determination whether the YMCA of South Hampton Roads should enjoy immunity from liability for the sexual assault of a young girl which occurred on the YMCA's premises. The *Ola* Court stated:

> [t]o establish charitable immunity as a bar to tort liability, an entity must prove at least two distinct elements. The absence of either element makes the bar of charitable immunity inapplicable. First, the entity must show it is organized with a recognized charitable purpose and that it operates in fact in accord with that purpose. In conducting this inquiry, Virginia courts apply a two-part test, examining (1) whether the organization's articles of incorporation have a charitable or eleemosynary purpose and (2) whether the organization is in fact operated consistent with that purpose. . . .
>
> Second, assuming the entity has met the foregoing test, it must then establish that the tort claimant was a beneficiary of the charitable institution at the time of the alleged injury.
>
> Thus, in order to determine whether an entity is entitled to charitable immunity, the court first examines the powers and purposes set forth in its charter. If an organization's charter sets forth a charitable or eleemosynary purpose, there is a rebuttable presumption it operates as a charitable institution in accordance

with that purpose. However, if the manner in which the organization actually conducts its affairs is not in accord with the charitable purpose, then the presumption may be rebutted and the bar of charitable immunity does not apply.

*Ola*, 270 Va. at 556-57 (quotations and internal citations omitted).

1. *HSF's Articles of Incorporation State a Charitable Purpose*

HSF's amended articles of incorporation[3] unequivocally state:

[t]he purposes for which the Foundation [HSF] is formed are exclusively charitable, scientific, and educational, as contemplated by Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. ... More particularly, the Foundation is organized and shall at all times be operated to assist medical education by teaching in a group practice setting within the academic environment of the University of Virginia, and, in particular, the University's Medical Center; to coordinate and deliver superior patient care therein, and in connection therewith to perform a public trust without regard to race, color, creed, sex, age, or ability to pay of the patients so served; and in concert with the University: (i) To provide hospital and medical care; (ii) To assist and conduct programs to cure, alleviate, and prevent human illness and disease; (iii) To provide teaching services on the undergraduate, post graduate, and continuing education level and to provide service generally to the various medical departments of the University's Medical Center; (iv) To assist and conduct programs of public charity to benefit patients who might not otherwise receive or be able to afford medical attention; (v) In furtherance of the above stated purposes to use and apply the whole or any part of the Foundation's income and principal exclusively for charitable, scientific, or educational purposes; (vi) To engage in any and all lawful activities incidental to the foregoing purposes except as limited herein. ....

---

[3] HSF amended its articles of incorporation in 1992. The quoted language below was not altered from the original articles of incorporation.

9/21 Hearing, Def.'s Ex. 1, 1-2. Similarly, in its original application for tax exempt status, see 1980 IRS Tax Form 1023 ("Form 1023"), HSF stated: "[H]ealth care services will be provided to the general public without regard to race, color, creed, sex, age, or ability to pay. One of the Foundation's purposes will be to assist and conduct programs of public charity to benefit patients who might not otherwise be able to afford medical attention." Further, HSF stated on its 1980 Form 1023:

> [t]he Medical Center charges a fee for most health services, but provides medical services to a substantial number of persons who do not have the financial means or insurance coverage to pay the usual fee. Tertiary care, as well as clinic services and emergency room care, is provided without regard to the patient's ability to pay.

9/21 Hearing, Def.'s Ex. 4, M008-009.

Thus, HSF's charter states a "charitable or eleemosynary" purpose. Under *Ola*, this creates a rebuttable presumption that it operates in accordance with that purpose. Plaintiff argues that HSF's purpose is not charitable, but rather, scientific or educational. The Court disagrees. That HSF's mission includes teaching and research does not negate its charitable character. Rather, it reinforces it.

### 2. *HSF Actually Operates as a Charity*

The next stage in the analysis is whether HSF actually *operates* as a charity. The Court concludes that HSF does, in fact, operate as a charity. Because HSF enjoys a rebuttable presumption that it operates as a charity, the burden is on the plaintiff to rebut that presumption. But even if the burden was on the defendant to convince the Court that it operates as a charity, the Court would find that the defendant has met its burden. The *Ola* Court articulated ten factors courts should consider when deciding whether an organization actually operates as a charity. The factors are the following:

1. Does the entity's charter limit the entity to a charitable or eleemosynary purpose?
2. Does the entity's charter contain a not-for-profit limitation?
3. Is the entity's financial purpose to break even or earn a profit?
4. Does the entity in fact earn a profit and, if so, how often does that occur?

.5. If the entity earns a profit (a surplus beyond expenses), must that be used for a charitable purpose?

6. Does the entity depend on contributions and donations for a substantial portion of its existence?

7. Is the entity exempt from federal income tax and/or local real estate tax?

8. Does the entity's provision of services take into consideration a person's ability to pay for such services?

9. Does the entity have stockholders or others with an equity stake in its capital?

10. Are the directors and officers of the entity compensated and, if so, on what basis?

*Id.* at 557 (citations omitted).

After evaluating each factor, the Court concludes that HSF operates as a charitable organization.

### a. *Does HSF's Charter Limit it to a Charitable or Eleemosynary Purpose?*

As previously quoted, HSF's articles of incorporation clearly state that "[t]he purposes for which the Foundation [HSF] is formed are *exclusively* charitable, scientific, and educational, as contemplated by Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. . . ." 9/21 Hearing, Def.'s Ex. 1, 1-2 (emphasis added).

The inclusion of the term "exclusive" in the above quoted passage from HSF's articles of incorporation is significant. According to HSF's charter, HSF was created to carry out exclusively charitable purposes. Consequently, the Court finds that HSF's charter does limit HSF to a charitable or eleemosynary purpose.

Plaintiff argues that HSF's purpose is not charitable at all, and certainly not exclusively charitable. In support of this argument, plaintiff emphasizes that the animating factor in the formation of HSF was to correct billing deficiencies and, further, that HSF aggressively seeks to collect payment from patients who have the ability to pay. True as these assertions are, they nevertheless in no way undermine HSF's charitable or eleemosynary purpose. There is nothing remarkable in the proposition that charities, like other enterprises, must sustain themselves in order to survive. A charity that annually delivers millions of dollars in medical care at no charge to indigents and whose patients' very lives depend on access to stable, reliable, routine,

consistent, and available medical treatment must especially strive to maintain financial health and stability. Efficient billing and rigorous collection efforts provide HSF the "revenue stream" necessary to perform its charitable mission. 9/21 Hearing 44-45.

b. *Does HSF's Charter Contain a Not-for-Profit Limitation?*

According to HSF's articles of incorporation, "[n]o part of the Foundation's net earnings shall inure to the benefit of any director or officer of the Foundation or to any private individual (except that reasonable compensation may be paid for services rendered to or for the Foundation)." 9/21 Hearing, Def.'s Ex. 1, 3.

HSF revenue is distributed in the following manner: (1) payment of what is colloquially referred to as the "Dean's Tax." Each year, HSF allocates 7% of its gross revenue to the Dean of the UVA School of Medicine for his or her use in advancing the mission of the medical school. Some uses of the "Dean's Tax" in the past have been for research support, construction of new facilities, and funding signing bonuses to attract and recruit top-notch physicians to oversee clinical departments, 9/21 Hearing 78, 288, (2) payment of HSF physicians' salaries and administrative staff salaries and overhead, and (3) allocations to the various departments within the UVA School of Medicine. 9/21 Hearing 132-33. Carter testified that "[a]ll of the funds that we collected except for our operating costs were passed back to the books of the medical school into the various departments. And when I say department, I mean like department of internal medicine, department of surgery, neurosurgery, pediatrics, what have you. And we would send those monies back into their accounts to be used by those departments; faculty costs, support staff costs, rent, operating supplies; that kind of thing." 9/21 Hearing 60. A department may also use a portion of its HSF allocation to fund salary bonuses for HSF physicians. Plaintiff suggests that the payment of such bonuses undermines HSF's claim of charitable immunity. Even with these bonuses, however, HSF physicians are still paid well within the mainstream of academic physicians, and less than private practicing physicians, as confirmed by Mr. Brad Haws, current HSF Chief Operating Officer. 9/21 Hearing 123 (stating that "physicians that are in private practice earn more than those that are in academic practice"). After these allocations, and after certain money is retained in reserves, there is no money left over. 9/21 Hearing 116.

c. *Is HSF's Financial Purpose to Break Even or to Earn a Profit?*

According to Haws, HSF's financial purpose is not to earn a profit. 9/21 Hearing 121. The Court credits Mr. Haws' testimony.

d. *Does HSF in Fact Earn a Profit and, If So, How Often Does That Occur?*

HSF does not earn a profit. Excess revenue is channeled back to the UVA School of Medicine. While it is true that HSF does retain some funds, this is to ensure that HSF does not go bankrupt during deficit years, according to Haws. 9/21 Hearing 136.

e. *If HSF Earns a Profit (a Surplus beyond Expenses), Must That Be Used for a Charitable Purpose?*

Again, as previously stated, any excess HSF revenue is channeled back to UVA School of Medicine to accomplish HSF's charitable objectives. Carter verified that "the rest of the money, [HSF excess revenue] would go back into those departmental coffers in the University." 9/21 Hearing 67. Plaintiff suggests that money that goes to support the medical school or hospital does not constitute spending in support of a charitable or eleemosynary purpose. It appears to be her theory that only direct patient services may be properly characterized as "charitable." This is far too cramped a definition of charitable or eleemosynary use of funds, and the Court does not adopt it.

Thus, the Court concludes that such a "surplus" is used for charitable or eleemosynary purposes. Haws testified that HSF also funds and provides charitable services in the form of tele-medicine services where HSF physicians video-conference with outlying areas' medical facilities in an effort to provide care to indigents in other areas of Virginia. HSF physicians also deliver medical care to international patients who may not otherwise qualify as indigents, but who are provided medical treatment nonetheless from an international humanitarian perspective. 9/21 Hearing 141-42. Additionally, HSF donates to UVA Hospital medical equipment that HSF purchased during the year. 9/21 Hearing 140.

*f. Does HSF Depend on Contributions and Donations for a Substantial Portion of Its Existence?*

Under the terms of its agreement with UVA School of Medicine, HSF is prevented from receiving contributions or donations. 9/21 Hearing 60. Both parties agree that HSF does not receive donations or contributions.

*g. Is HSF Exempt from Federal Income Tax and/or Local Real Estate Tax?*

HSF is exempt from federal taxes as a § 501(c)(3) organization. See, i.e., "IRS Determination Letter," Defendant's Special Plea of Charitable Immunity, Ex. 1, A001 (stating that the IRS "has determined that [HSF] is exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code"). Carter stated that, during his eighteen year tenure as Chief Executive Officer of HSF, from 1980 until 1998, HSF enjoyed status as an organization exempt from federal taxes under § 501(c)(3). 9/21 Hearing 58. Haws confirmed that HSF presently enjoys exemption from federal taxation as a § 501(c)(3) organization. 9/21 Hearing 120.

Further, according to Mr. Mark Echelberger, a Certified Public Accountant who testified as a defense expert witness, 9/21 Hearing 184-85, the IRS classifies HSF as a "public charity" and as a § 509(a)(3) supporting organization for UVA. The plaintiff acknowledges that HSF is a § 509(a)(3) tax exempt organization as a supporting entity for UVA. 9/21 Hearing 208 (stating that "HSF is a wonderfully supportive, collaborative, cooperative, supporting organization under § 509(a)(3) for [the] University of Virginia and the School of Medicine"). See also the testimony of the plaintiff's expert witness, Robert Tobey. 9/21 Hearing 240.

*h. Does HSF's Provision of Services Take into Consideration a Person's Ability to Pay for Such Services?*

HSF provides its medical and surgical services without regard to a patient's ability to pay. Indeed, a physician generally does not even know if a patient is a paying patient or a medically indigent patient receiving treatment at no cost. 9/21 Hearing 120 (stating that "[t]he physicians by and large are not really even aware if the patient pays their bill. Their access to the physician and certainly the quality of care that they receive has no relevance to whether the bill was paid or whether the person was indigent or had other third-party insurance coverage"). As a direct consequence of HSF's

commitment to treating patients without regard to their ability to pay, HSF has provided millions of dollars annually in free medical care to indigents. According to the plaintiff's exhibit 5 submitted at the 9/21 Hearing, HSF spends approximately $20 million per year on indigent care. Specifically, in fiscal year 2002, HSF spent approximately $20.0 million on indigent care; in fiscal year 2003, HSF spent approximately $21.3 million on indigent care; and in fiscal year 2004, HSF spent approximately $21.6 million on indigent care. Moreover, as Haws stated, HSF provides *all* necessary medical treatments to indigent patients. This includes preventative care and screening tests. 9/21 Hearing 166-68. This distinguishes HSF from other health care providers. While other providers may render emergency care or stabilize patients regardless of a patient's ability to pay, HSF goes much further than this. HSF provides *all* necessary medical treatment.

Plaintiff asserts that the amount of care rendered indigents is *de minimis*. 9/21 Hearing 280. It most certainly is not. Whether the amount of indigent care given is valued at $20 million or valued at $3 to 4 million,[4] it cannot be described as *de minimis*. Indeed, Haws testified that approximately 10 to 12% of HSF patient care is rendered to indigents. 9/21 Hearing 130. This is not *de minimis* by any calculus. Even when viewed in comparison to HSF's overall revenues, the amount of patient care rendered to indigents is significant. Further, according to Haws, HSF and the Medical College of Virginia provide the "vast majority" of medical care to indigent patients in Virginia. 9/21 Hearing 124-25. Carter verified that during his eighteen years at HSF, HSF and the Medical College of Virginia provided the most care to indigent patients in Virginia. 9/21 Hearing 70.

---

[4] Plaintiff argues that the $20 million figure is inflated since HSF typically does not collect a dollar for every dollar billed, but rather, HSF typically collects approximately one-third of its billed amount. According to Mr. Higgins, HSF's Director of Billing and Collections, HSF has a collection rate of 38% of all payers. 9/21 Hearing 44. Thus, plaintiff argues, HSF does not really provide $20 million in indigent care but rather more on the order of $7 million. That figure, plaintiff argues, is further reduced by state and federal reimbursement for HSF's indigent services, resulting in the $3 to 4 million dollar figure. 9/21 Hearing 160. See also Pl.'s Opp. 11. While the Court understands the rationale for reducing HSF's $20 million figure by the amount of state and federal reimbursements, the Court does not agree that indigent care costs should be discounted by two-thirds to reflect HSF's "typical" rate of patient payments. For an indigent patient, there is no "typical" rate of patient payments. Indeed, there are no payments at all. In such a situation, the fact that HSF might not recover dollar for dollar had the patient been a paying patient is irrelevant.

While this Court finds the amount HSF actually spent on indigent patient care in the last several years to be materially significant, it would be a mistake to place undue emphasis on this factor. It has the potential to divert attention away from the real point, which is this: HSF's character as a charity is demonstrated not so much by what it spends on indigent care during any particular year but by the fact that its doctors are available and its doctors remain available for *any* indigent patient who requires medical assistance. Whether HSF in a given year actually treats a thousand indigent patients or ten thousand indigent patients, these numbers are far less significant than the fact that HSF's doctors are available to all patients, not only to those patients with health insurance, but to those without health insurance, and not only to the poor who can pay little, but to the desperately poor who can pay nothing at all.

Moreover, patient care to indigents cannot be examined at a macro level only. It must also be examined at the individual level, i.e., at the level of the medically indigent patient who receives significant, often life saving, certainly life enhancing, medical care that he otherwise could not afford. To that patient, there is nothing remotely *de minimis* about what he or she receives, whether it is cardiac surgery, or chemotherapy, or other treatment for cancer, or routine OB/GYN visits in the course of a pregnancy, or well-baby checks, or critical care for a premature infant in a neo-natal intensive care unit, or screening tests like colonoscopies or mammograms or CAT scans or MRIs. The indigent patient gets *all* medically necessary treatment, and he gets it again and again, and he gets it indefinitely, and, once having been certified medically indigent, he gets it without receiving a single bill. Far from *de minimis*, the value of these services to the medically indigent person or family is simply incalculable.

i. *Does HSF Have Stockholders or Others with an Equity Stake in its Capital?*

As Carter stated, "HSF does not have any shareholders or any stock or anything like that. … There were no dividends. There were no bonuses, of a nature like a shareholder kind of sort of thing. There was an incentive system for the physicians which was controlled by the School of Medicine, but other than that no profit sharing or thing of that type." 9/21 Hearing 66-67. The Court finds that HSF does not have stockholders or others with an equity stake in its capital.

*j. Are HSF Directors and Officers Compensated, and If So, on What Basis?*

According to HSF's articles of incorporation, "[n]o part of the Foundation's net earnings shall inure to the benefit of any director or officer of the Foundation or to any private individual (except that reasonable compensation may be paid for services rendered to or for the Foundation)." 9/21 Hearing, Def.'s Ex. 1, 3. HSF directors and officers do not receive additional compensation from HSF for being members of the Board of Directors.

As to physicians' salaries, plaintiff argues that they are so substantial as to negate any claim that HSF is a charity. In support of this argument, plaintiff cites the salaries of several of HSF's highest paid physicians. These salaries, however, cannot be viewed in a vacuum. Rather, they must be viewed in comparison to what physicians in academic settings typically earn. In that connection, Haws testified that HSF strives to compensate its physicians at the fiftieth to fifty-fifth percentile of academic salaries established by the American Association of Medical Colleges. 9/21 Hearing 173-74. (While some physicians are paid more, others are paid less. *Id.*) The purpose of paying salaries at this level is to remain competitive and attractive to highly qualified physicians. It clearly does not negate HSF's claim that it operates as a charity. *Id.*

In summary, HSF operates as a charity. The Court reaches this conclusion despite the fact that HSF does not accept donations, which relates to the sixth *Ola* factor. As the *Ola* Court noted, however, "the presence or absence of any one particular factor is not determinative." *Ola*, 270 Va. at 557. The fact that HSF does not accept donations simply does not diminish or undermine its status as a charity.

### 3. *Crystal Ann MacArthur Benefited from HSF's Charitable Services*

The final determination which this Court must make under *Ola* is whether the plaintiff was a beneficiary of the defendant's charitable services. As a patient of HSF physicians, Crystal Ann MacArthur was a beneficiary of HSF's charitable services, even though she was covered by Medicaid. Virginia charitable immunity law adopts a broad definition of beneficiary. Under *Ola*, a beneficiary is someone who receives "something of value, which the organization by its charitable purpose, undertakes to provide." *Ola*, 270 Va. at 564 (*citing Egerton v. R. E. Lee Memorial Church*, 395 F.2d 381, 384 (4th Cir. 1934)). Thus, whether a patient enjoys private medical insurance, is

medically indigent, or receives public assistance in the form of Medicaid or Medicare, all patients who receive medical care from HSF physicians are beneficiaries under *Ola*.

According to the plaintiff, she arrived at UVA Hospital on June 30, 2002 and was subsequently admitted. There she received medical treatment from HSF physicians. Accordingly, plaintiff was a beneficiary of HSF's charitable services.

### Conclusion

Plaintiff asserts that a decision upholding charitable immunity would create a "tort free zone where none of the patients have any access to the court system, no due process of laws, no equal protection of laws to bring a remedy in the event of negligent death, negligent injury." 9/21 Hearing 21. This Court recognizes that its decision upholding charitable immunity for HSF extends immunity to HSF for the negligent acts it is alleged to have committed when treating the plaintiff. Whether the individual HSF physicians who rendered care to the plaintiff are also immune from a negligence claim is a question not presently before the Court. The individual HSF physicians responsible for the plaintiff's care are not defendants in the instant action. While there is case law that indicates that employees of a charity are cloaked in the same immunity afforded the charity, see, e.g., *Moore v. Warren*, 250 Va. 421, 423 (1995), that issue is not before the Court.

This Court also recognizes the very serious harm allegedly caused by the defendant's negligence. Nevertheless, there is nothing in *Ola* to suggest that the Court may weigh such considerations in determining whether an entity is entitled to charitable immunity. Indeed, *Ola* itself involved an exceptionally grave injury; specifically, a thirteen-year old child was abducted and sexually assaulted in a bathroom on the YMCA premises. Yet *Ola* is limited to a determination as to whether the charity was organized with a recognized charitable purpose, whether it operated in accordance with that purpose, and whether the tort claimant was a beneficiary of the charity at the time of the alleged injury. These inquiries must control the resolution of the instant case as well.

Plaintiff argues that *James v. Jane*, 221 Va. 43 (1980), supports her position that this Court ought to, indeed must, consider the public policy implications of its decision. The Court disagrees. While it is true that *James* dealt with an issue of immunity and its applicability to allegedly negligent physicians, the salient fact is that the immunity at issue in *James* was

338

sovereign immunity, not charitable immunity. The rationale for sovereign immunity and the issue of whether sovereign immunity should extend to a state hospital's physicians is an issue wholly different from that presented in the instant case.

For the foregoing reasons, the special plea of charitable immunity is sustained and the matter is, therefore, dismissed with prejudice.