PRESENT:  All the Justices

DOUGLAS E. PIKE

v.  Record No. 151193

KATHRYN S. HAGAMAN

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
June 2, 2016

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Gregory L. Rupe, Judge

Douglas E. Pike, the plaintiff in a medical malpractice action, challenges the trial court's dismissal of his complaint on the basis of sovereign immunity.  Pike argues that the defendant Kathryn S. Hagaman, a registered nurse in the Surgical Trauma Intensive Care Unit at Virginia Commonwealth University, or VCU, Medical Center is not entitled to sovereign immunity. Applying the four factor test from James v. Jane, 221 Va. 43, 282 S.E.2d 864 (1980), we disagree and affirm.

## I.  BACKGROUND

Pike was a surgical patient at VCU Medical Center, a hospital that is part of the VCU Health System.  He underwent a complex and lengthy surgery lasting over 12 hours to reconstruct his hard and soft rear palates, i.e., the back of his mouth.  Very few hospitals in Virginia can perform such a surgery, with VCU Medical Center being the only one in central Virginia that can perform it.

Following the surgery, Pike was taken to the Surgical Trauma Intensive Care Unit for recovery.  This intensive care unit is a specialized unit, which "has the infrastructure and the expertise to manage the most complex surgical patients in the hospital."  Post-operative care in this unit requires "a minute-to-minute obligation to manage the post-operative care such that the patient continues to improve."  The patients are often in very critical condition and, therefore,

require "complex nursing care." Each nurse in this unit is responsible for two patients at most. Nurses must observe and assess patients, closely monitor vital signs, monitor the drugs that might be required for blood pressure support, care for patients on ventilators, and carry out "the complex orders that might be written by the surgery team." To provide this care, the nurses in the unit are highly trained, including in "postanesthetic care, postoperative care, wound care, and the management of unstable patients."

The environment is a collaborative one in which residents frequently consult and work closely together with the nurses in caring for the patients. The residents' interaction with the nurses is integral to the training curriculum. Nurses participate in the orientation of the residents to the unit and support the residents by providing information.

Pike's surgery included making an incision in his neck to permit the insertion of a ventilator tube. Following a surgery such as the one Pike underwent, it is important to keep the patient's head stable to enable blood to flow. Dr. Marc Sarcia placed an order in the "order section" of Pike's chart which stated, among other things: "Please do not apply any pressure to the right neck area in the vicinity of the incision." The doctors overseeing Pike's care did not write any orders specifically governing the position of his head or neck; i.e., they did not order the nurses to maintain Pike's head in a neutral or midline position. According to testimony from multiple witnesses, nurses were required to exercise judgment and discretion in determining how to position the patient's head and how to avoid pressure in the vicinity of the neck incision. A surgeon at the hospital testified that he would rely on the skill and expertise of the nurse to position the patient's head appropriately following surgery.

Progress notes for the day after Pike's surgery stated, "Keep head in neutral position," and "[n]o pressure to right side of face/neck."[1] Dr. Andrea Pozez testified that nurses are not required to read progress notes, and Hagaman testified that progress notes are not the same as orders.

During the morning five days after the surgery, Pike was found with his neck tilted to the right, a position that would cause "venous compromise." The staff on the floor was instructed to avoid this practice. That afternoon, Dr. Christopher Campbell, Pike's attending physician, found Pike again in that position. Pike's face and neck were massively swollen. As a consequence, Pike had to undergo further surgery in an effort to salvage the palate reconstruction surgery. Those efforts were not successful and reconstruction surgery was for naught.

VCU Health System Authority paid nurse Hagaman's wages and her pay did not vary based on the number of patients that she saw. She did not bill patients for the care she provided. A scheduling committee made up of other staff nurses set her work hours and approved her leave from work. She had no discretion to refuse to see a patient.

Pike filed a medical malpractice action, alleging that Hagaman was negligent. In response, Hagaman filed a plea of sovereign immunity. Following the presentation of evidence, the trial court granted Hagaman's plea. In a memorandum opinion, the court outlined the evidence and concluded that sovereign immunity barred the action. This appeal followed.

---

[1] Pike asserts that a physician placed "a large sign on the wall of Pike's room . . . that notified all concerned not to permit Pike's head to turn to the right, and that his head and neck needed to be kept upright or elevated at all times without pressure to the neck and face." The record establishes that a doctor wrote an order to have a sign placed on the bed that stated Pike's head should be kept in a "neutral or slightly chin left" position "at all times." This order was given after Pike's head was found in a slumped position, and not before that time.

3

## II. ANALYSIS

We review de novo a trial court's ruling on a plea of sovereign immunity. City of

Chesapeake v. Cunningham, 268 Va. 624, 633, 604 S.E.2d 420, 426 (2004). Furthermore,

> [w]hen evidence is presented "on [a] plea ore tenus, the circuit
> court's factual findings are accorded the weight of a jury finding
> and will not be disturbed on appeal unless they are plainly wrong
> or without evidentiary support."

McBride v. Bennett, 288 Va. 450, 454, 764 S.E.2d 44, 46 (2014) (quoting Hawthorne v.

VanMarter, 279 Va. 566, 577, 692 S.E.2d 226, 233 (2010)).

The doctrine of sovereign immunity remains "alive and well in Virginia."

Commonwealth ex rel. Fair Hous. Bd. v. Windsor Plaza Condo. Ass'n, 289 Va. 34, 56, 768

S.E.2d 79, 89 (2014) (quoting Jean Moreau & Assocs. v. Health Ctr. Comm'n, 283 Va. 128, 137,

720 S.E.2d 105, 110 (2012)). The doctrine "is 'a rule of social policy, which protects the state

from burdensome interference with the performance of its governmental functions and preserves

its control over state funds, property, and instrumentalities.'" City of Virginia Beach v.

Carmichael Dev. Co., 259 Va. 493, 499, 527 S.E.2d 778, 781 (2000) (quoting Hinchey v. Ogden,

226 Va. 234, 240, 307 S.E.2d 891, 894 (1983)). Because "government can function only through

its servants . . . certain of those servants must enjoy the same immunity in the performance of

their discretionary duties as the government enjoys." First Va. Bank-Colonial v. Baker, 225 Va.

72, 79, 301 S.E.2d 8, 12 (1983).

"A plea of sovereign immunity is a defensive plea presenting distinct issues of fact

which, if proved, create a bar to the plaintiff's right of recovery. As the moving party, the [state

employee] bear[s] the burden of proving those issues of fact." Whitley v. Commonwealth, 260

Va. 482, 493, 538 S.E.2d 296, 302 (2000) (citation omitted).

4

In James, we declined to impose a bright line rule to determine whether an allegedly negligent state employee is protected by the shield of sovereign immunity. 221 Va. at 53, 282 S.E.2d at 869. We developed a list of four non-exclusive factors to assess whether a plea of sovereign immunity should be sustained. These four factors are:

1.      The function the employee was performing;

2.      The state's interest and involvement in that function;

3.      Whether the act performed by the employee involved the use of judgment and discretion; and

4.      The degree of control and direction exercised by the state over the employee.[2]  Id.


A.      THE FUNCTION HAGAMAN WAS PERFORMING AND THE STATE'S INTEREST IN THAT FUNCTION.

With respect to the first two factors, "if the function that a government employee was negligently performing was essential to a governmental objective and the government had a great interest and involvement in that function, those factors would weigh in favor of the employee's claim of sovereign immunity." Lohr v. Larsen, 246 Va. 81, 85, 431 S.E.2d 642, 644 (1993). Conversely, "if that function has only a marginal influence upon a governmental objective, and the government's interest and involvement in that function are slight, these factors weigh against granting governmental immunity to a government employee." Id. (internal quotation marks omitted).

Pike contends that Hagaman was engaged in routine patient care, and that her care "had only a marginal influence on furthering any governmental interest or objective." It is true that in James we stated that "[t]he state's interest and the state's involvement, in its sovereign capacity,

_____

[2] Neither party suggests that we consider any factors beyond the four articulated in James v. Jane, 221 Va. at 53, 282 S.E.2d at 869. Accordingly, we confine our analysis to these factors.

5

in the treatment of a specific patient by an attending physician in the University Hospital are slight." 221 Va. at 54, 282 S.E.2d at 870. That statement, however, was made against the backdrop of our assessment of the governmental interest served by the University of Virginia Hospital. As for that hospital, we concluded, at the time, that "the paramount interest of the Commonwealth of Virginia [was] that the University of Virginia operate a good medical school and that it be staffed with efficient and competent administrators and professors." Id. In Lohr, in contrast, we sustained the plea of sovereign immunity, in part, because the general care provided by the physician defendant was integral to the governmental objective of "attempting to provide quality medical care in certain specified areas for citizens of this State who are economically unable to acquire those services in the private sector." 246 Va. at 86, 431 S.E.2d at 644-45.

The governmental objectives articulated by the General Assembly in the Code of Virginia certainly constitute compelling evidence of the Commonwealth's interest in a particular function. We have previously consulted legislative enactments in assessing the governmental objective at stake. Id. at 86, 431 S.E.2d at 645. The General Assembly has found that the "[p]rovision of health care, including indigent care, is an essential governmental function protecting and promoting the health and welfare of the citizens of the Commonwealth." Code § 23-50.16:2(1). More specifically, Code § 23-50.16:2(4) provides that the essential missions of the VCU Medical Center, formerly known as the Medical College of Virginia Hospital, include serving as a "general hospital and health care facility" and "provid[ing] high quality patient care and other specialized health services not widely available in the Commonwealth," and that these "missions constitute essential governmental functions."

By "provid[ing] specialized health services not widely available in the Commonwealth" through the Surgical Trauma Intensive Care Unit, Hagaman was serving an "essential

6

governmental function[].” Code § 23-50.16:2. The trial court found that Hagaman “has a great depth of expertise in offering this kind of specialized care.” In addition, the court found that Hagaman’s actions “were essential to carrying out the express interest of the Commonwealth as embodied in Code [§] 23-50.16:2(4).” We agree with the trial court’s assessment. The first two factors of our James test, therefore, support a finding of sovereign immunity.

B.      HAGAMAN’S USE OF JUDGMENT AND DISCRETION.

“[A] government employee’s use of judgment and discretion is an element in determining the issue of immunity.” Lohr, 246 Va. at 87, 431 S.E.2d at 645. The presence of discretion supports a finding of immunity. Id. We have recognized that “[v]irtually every act performed by a person involves the exercise of some discretion,” and, therefore, the presence of discretion is not always determinative. James, 221 Va. at 53, 282 S.E.2d at 869.

There are two important caveats with respect to this factor. First, “[t]he defense of sovereign immunity applies only to acts of judgment and discretion which are necessary to the performance of the governmental function itself.” Heider v. Clemons, 241 Va. 143, 145, 400 S.E.2d 190, 191 (1991). Second, regardless of the existence of discretion in the overall job, there is no sovereign immunity for the negligent performance of ministerial acts. Baker, 225 Va. at 78, 301 S.E.2d at 11.

The evidence does not support Pike’s claim that Hagaman was performing a ministerial act. First, the evidence establishes that Hagaman had to exercise her discretion to determine how to carry out the doctor’s orders to avoid pressure in the vicinity of Pike’s neck incision and to keep his head in a neutral position. Second, the specific omissions alleged, i.e., Hagaman’s failure to monitor the position of Pike’s head and failure to avoid pressure near the incision, cannot be viewed in artificial isolation. In other words, the exercise of judgment and discretion

7

is unavoidably contextual. Cf. McBride, 288 Va. at 455-56, 764 S.E.2d at 47-48 (reviewing and considering contextual factors in automobile-related sovereign immunity cases). Hagaman's sphere of responsibility extended beyond simply positioning the patient and avoiding pressure near the neck incision. She had to prioritize and address many tasks. According to the evidence, she was required to provide "minute to minute" care by, among other things, monitoring a patient's drugs, checking his vital signs, and consulting with residents. Hagaman was exercising discretion in caring for Pike. Therefore, this factor, while not determinative, supports a finding of sovereign immunity.

C.   THE STATE'S CONTROL AND DIRECTION OVER HAGAMAN.

"A high level of control [by the state over an employee] weighs in favor of immunity; a low level of such control weighs against immunity." Lohr, 246 Va. at 88, 431 S.E.2d at 646. We observed in Lohr that

> [a]t first glance, the issue of wide discretion that influences our consideration of the grant of governmental immunity in applying the third element of the James test appears to be at odds with our consideration of a higher level of governmental control in the application of the fourth element of that test in this case.

Id. We explained, however, that "when a government employee is specially trained to make discretionary decisions, the government's control must necessarily be limited in order to make maximum use of the employee's special training and subsequent experience." Id.

In contrast to James, where the physicians "exercise[d] broad discretion in selecting the methods by which they care[d] for [their patients]," 221 Va. at 48, 282 S.E.2d at 866, Hagaman's discretion was cabined by physicians' orders. In addition, the physicians in James could refuse to accept a particular patient. Id. Hagaman had no such option. The trial court found that the hospital "had a high degree of control over Hagaman, who was supervised by more senior

8

nursing staff" and that she was subject to the hospital's policies. The state hospital pays her wages and determines her schedule and whether she can take leave. This fourth factor also points in the direction of sovereign immunity.

### III. CONCLUSION

Our assessment of the four James v. Jane factors in this specific context leads us to affirm the trial court's dismissal on the ground of sovereign immunity.[3] We, therefore, affirm the decision of the trial court.

Affirmed.

JUSTICE MIMS, with whom JUSTICE GOODWYN joins, dissenting.

I agree that this case can be resolved using the four factors enumerated in James v. Jane, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980). However, I disagree that the application of those factors entitles the defendant to the protection of sovereign immunity. I therefore respectfully dissent.

In James, two patients sought to recover damages from their physicians, who were faculty members of the University of Virginia Medical School, for negligent treatment the patients alleged they received at the University Hospital. Id. at 45-46, 282 S.E.2d at 864-65. We noted that

> [t]he state is of course interested and concerned that patients who are treated at the University Hospital receive proper medical care. However, the state has this same concern for every patient who is treated in any private hospital or by any doctor

---

[3] Pike argues that a finding of sovereign immunity in this instance would mean that "virtually no claim . . . could ever be asserted against nursing staff for negligence." We disagree. As with physicians, where immunity may or may not be present, compare James, 221 Va. at 55, 282 S.E.2d at 870, with Lohr, 246 Va. at 88, 431 S.E.2d at 646, so it is with nurses. Our multi-factor test in James eschews categorical rules in favor of fact-specific, fine-grained analysis. See Colby v. Boyden, 241 Va. 125, 130, 400 S.E.2d 184, 187 (1991) ("[E]ach case must be evaluated on its own facts . . . .").

9

throughout the Commonwealth. This is evidenced by the numerous statutes enacted by the General Assembly of Virginia designed to assure adequate medical care and medical facilities for the people of the state. The state's interest and the state's involvement, in its sovereign capacity, in the treatment of a specific patient by an attending physician in the University Hospital are slight; equally slight is the control exercised by the state over the physician in the treatment accorded that patient. This interest and involvement is not of such moment and value to the Commonwealth as to entitle [the defendants] to the immunity enjoyed by the state.

Id. at 54, 282 S.E.2d at 870.

Circuit courts have repeatedly applied this language to conclude that although the Commonwealth has a general interest in patient care provided by nurses, that interest is insufficient to justify extending sovereign immunity to protect them from liability for their alleged negligence. White v. Simon, 87 Va. Cir. 308, 311-14 (Charlottesville Cir. Ct. Dec. 4, 2013); White v. Belgrave, 87 Va. Cir. 303, 306-07 (Charlottesville Cir. Ct. Dec. 4, 2013); Roush v. West, 83 Va. Cir. 407, 414 (Charlottesville Cir. Ct. Oct. 5, 2011); Gaines v. Health Servs. Found., 80 Va. Cir. 336, 339-43 (Charlottesville Cir. Ct. Apr. 30, 2010); McCandlish v. Kron, 38 Va. Cir. 302, 304-05 (Albemarle Cnty. Cir. Ct. Jan. 11, 1996). Each of these cases also involved highly trained nurses who, like the defendant in this case, worked in specialized treatment units. Simon, 87 Va. Cir. at 308-09 (nurse treated the plaintiff's decedent in the thoracic cardiovascular post-operation unit); Belgrave, 87 Va. Cir. at 303-04 (nurses treated the plaintiff in the digestive health center); Roush, 83 Va. Cir at 413 (nurse treated the plaintiffs' decedent in the pediatric cardiology clinic); Gaines, 80 Va. Cir. at 336-37 (nurse treated the plaintiff in the neonatal intensive care unit); McCandlish, 38 Va. Cir. at 303 (nurses treated the plaintiffs' decedent in the pediatric intensive care unit).

Although the majority relies on the distinction between the governmental objectives the General Assembly attributed to the Virginia Commonwealth University Health System Authority

10

in Code § 23-50.16:2 and the "paramount" educational purpose of the University of Virginia Medical Center in James, 221 Va. at 54, 282 S.E.2d at 870, that educational purpose was not the principal ground for our holding in James. Rather, we concluded that the Commonwealth's interest in proper medical care is the same regardless of whether the facility is public or private. Thus, the stated statutory objectives of providing high-quality patient care and promoting health and welfare at the VCU Medical Center are indistinguishable from the objectives of any health care facility, public or private.

Accordingly, the Commonwealth's interest in the performance of one particular nurse in the treatment of one particular patient is the same regardless of the character of the facility where the treatment occurs.[1] The only difference, under the majority opinion, is that a nurse at a private facility may be held liable for his or her professional negligence while a nurse at an identical facility owned and operated by the state cannot be. Whatever benefit this disparity may yield for the public treasury, and thus indirectly for the taxpayer, it promotes neither conscientious and competent performance by medical professionals employed at state medical facilities compared to their private sector counterparts, nor diligent and proactive supervision of

---

[1] To paraphrase our conclusion in James, changing only "physician" to "nurse,"

> The only issue we decide here is whether a [nurse], employed by an agency of the Commonwealth of Virginia and practicing in a hospital operated by such an agency, should be immune from an action for his negligence, i.e., for his failure to exercise reasonable care in attending a patient. In Eriksen v. Anderson, 195 Va. 655, 660-61, 79 S.E.2d 597, 600 (1954), we said: "There is no statute which authorizes the officers or agents of the State to commit wrongful acts. On the contrary, they are under the legal obligation and duty to confine their acts to those which they are authorized by law to perform. If they exceed their authority, or violate their duty, they act at their own risk, . . . and the State is not responsible or liable therefor." . . . A [nurse] who fails to use reasonable care in the treatment of a patient acts at his own risk, and is not entitled to invoke the doctrine of sovereign immunity.

221 Va. at 55, 282 S.E.2d at 870.

11

such employees at state facilities that are immune from the consequences of their negligence.  In short, the majority's holding makes it less likely, rather than more likely, that the Commonwealth's stated objective of providing high-quality patient care will be met.

Relying on James, I therefore would reverse the circuit court's holding that the defendant was entitled to sovereign immunity and remand for further proceedings.