PRESENT: Goodwyn, C.J., Powell, Kelsey, McCullough, and Chafin, JJ., and Koontz, S.J.

KAREEM PATTERSON, PERSONAL
REPRESENTATIVE OF THE ESTATE
OF LANGSTON PATTERSON, DECEASED

OPINION BY
v. Record No. 210509                                  JUSTICE D. ARTHUR KELSEY
JULY 7, 2022
CITY OF DANVILLE, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
James J. Reynolds, Judge

Langston Patterson died a few months after suffering from cardiac arrest while an inmate

in the Danville Adult Detention Center ("DADC"). The personal representative of Patterson's

estate sued the DADC physician, Dr. Laurence Shu-Chung Wang, claiming that Dr. Wang

committed medical malpractice by failing to provide appropriate care to Patterson. The circuit

court granted Dr. Wang's plea in bar to the estate's negligence claim, holding that he was

protected by derivative sovereign immunity. The court also granted Dr. Wang's demurrer to the

estate's gross negligence claim because it was insufficiently pleaded. Finding no legal error in

either of these decisions, we affirm.

I.

In cases decided after an ore tenus hearing, we give the court's findings the same

"weight" as a jury verdict. *See Pike v. Hagaman*, 292 Va. 209, 214 (2016) (citations omitted).

For the purposes of reviewing sovereign immunity, therefore, we will recite the evidence in the

light most favorable to Dr. Wang, the prevailing party before the circuit court sitting as the

factfinder.

A.

The timeline of relevant events begins when Patterson entered the DADC and ends with

his death approximately nine months later.

On November 4, 2016, Patterson was incarcerated in the DADC, a minimum-security detention center owned and operated by the City of Danville. A few days after Patterson's admission, the correctional health assistant completed an "Intake Inmate Medical Sheet," J.A. at 5, and noted Patterson's various medical and psychiatric conditions, including Patterson's medical history of diabetes, hypertension, depression, and schizoaffective disorder.

On November 10, after Patterson exhibited symptoms of confusion, Dr. Wang and the correctional health assistant met with Patterson. Patterson's blood pressure was elevated, and Dr. Wang prescribed Clondine and Amlodipine "in an attempt to treat" Patterson's "high blood pressure." *Id.* at 6. Dr. Wang also directed that a comprehensive metabolic panel and complete blood count be obtained for Patterson.

On November 11, the DADC transported Patterson to the Danville Regional Medical Center. The hospital treated him for electrolyte imbalances, metabolic toxic encephalopathy, dehydration, hyponatremia, hypokalemia, acute kidney injury, ketosis, and diabetes. Patterson's hyponatremia resolved after he was placed on a saline intravenous drip, and he returned to the DADC the next day with various prescriptions for the other diagnoses.

On November 16, Dr. Wang again examined Patterson and noted that Patterson's symptoms included gastric reflux syndrome, blurred vision, and shoulder pain. Dr. Wang prescribed Atenolol, Zantac, and Ibuprofen to help Patterson with these symptoms.

On December 5, the DADC's correctional health assistant noticed that Patterson was experiencing an altered mental status. Dr. Wang examined Patterson the next day, diagnosed him with experiencing psychosis, and put Patterson on a regime of Haldol, an anti-psychotic medication.

On December 23, Patterson complained that his feet were swelling. Dr. Wang considered this symptom to be a possible side effect of Haldol and prescribed Cogentin to address the swelling. Over a month later, Patterson experienced tooth pain and underwent a tooth extraction. Dr. Wang examined him after the extraction.

On February 15, 2017, Patterson appeared to be anxious and mentally disturbed. He reported hearing voices, finding sleep elusive, and vomiting at night. Dr. Wang treated these conditions as a depressive syndrome and prescribed Nortriptyline, an antidepressant medication.

On February 20, Patterson suffered cardiac arrest in his cell. Medical personnel resuscitated Patterson, but he never regained consciousness. He died five months later on July 31, 2017, at the Danville Regional Medical Center.

B.

Through its personal representative, Patterson's estate filed suit against Dr. Wang and others for ordinary and gross negligence. Only the claims against Dr. Wang remain in contest on appeal. The circuit court conducted an evidentiary hearing to determine whether Dr. Wang was protected by the City's sovereign immunity.

Considered in the light most favorable to Dr. Wang, the prevailing party in the circuit court, the evidence showed that the City owned and operated the DADC as well as all medical equipment and supplies within it. The Virginia Board of Corrections promulgated medical standards for the DADC and similar facilities, regularly inspected the DADC for compliance, and conducted recertification reviews every three years. These requirements protected the inmates' constitutional and statutory rights to medical care while incarcerated. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration."); Code

3

§ 53.1-126 (providing that, subject to certain exceptions, "medical treatment shall not be withheld for any communicable diseases, serious medical needs, or life threatening conditions").

Consistent with the DADC's legal duties, the DADC director drafted policies and procedures governing the medical care of inmates. The DADC director testified that he had the ultimate responsibility for ensuring that inmates are provided with appropriate medical care. The City employed Dr. Wang as the DADC physician, paid him on an hourly basis, required him to come to the DADC at least once a week to treat inmates and to consult with the DADC director about the inmates' medical needs. Dr. Wang also treated inmates at other City facilities.

No inmates were asked to pay or required to pay for Dr. Wang's medical care. The inmates did not choose Dr. Wang as their physician, nor did he choose them as his patients. Under the terms of his employment, Dr. Wang was obligated to treat any inmate who requested Dr. Wang's medical care. Dr. Wang was also required to use the examination rooms at the DADC as well as the medical equipment and supplies kept on site. When treating patients, Dr. Wang wore personal protective gear supplied by the DADC. The medical records created by Dr. Wang were kept at the DADC. All prescriptions were filled by the DADC staff at a local pharmacy pursuant to a contract between the City and the pharmacy.

In aggregate, these facts demonstrate that the DADC controlled when and where Dr. Wang worked, the number and identity of the patients that he saw, the medical equipment that he used on site, and the medical policies and procedures that governed his work at the DADC. He could not refuse to see any patient and could not receive compensation from any patient. His salary was paid by the City, calculated on an hourly basis. And unlike a private physician treating patients, Dr. Wang served as an agent of the City, charged with a constitutional and statutory duty to provide medical care to a specific class of patients.

4

II.

On appeal, Patterson argues that Dr. Wang is not entitled to derivative sovereign immunity, and, even if Dr. Wang were entitled, his gross negligence precludes him from asserting it. The circuit court rejected both assertions, as do we.

A.

While sovereign immunity has stood the test of time, the testing process seems to never end. It began at the very founding of our nation. Five years after the ratification of the United States Constitution, *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793), held that sovereign immunity was inimical to a constitutional republic in which the people, not the government, are sovereign. *See generally* Randy E. Barnett, *The People of the State?:* Chisholm v. Georgia *and Popular Sovereignty*, 93 Va. L. Rev. 1729, 1730-31 (2007). Shortly after losing in *Chisholm*, the State of Georgia reasserted its sovereignty by passing a bill that charged anyone attempting "to enforce the *Chisholm* decision" with a capital crime. *Alden v. Maine*, 527 U.S. 706, 721 (1999). A day after the United States Supreme Court decided *Chisholm*, Congress introduced a bill amending the Constitution to overturn the decision. *Id.* That bill led to the adoption of the Eleventh Amendment. *See id.*

Since then, the sovereign-immunity doctrine in Virginia has persevered "alive and well," *Commonwealth ex rel. Fair Hous. Bd. v. Windsor Plaza Condo. Ass'n*, 289 Va. 34, 56 (2014) (citation omitted),[1] though not without substantial debate over its permissible scope and the consistency of its applications.[2] Addressing some of these concerns, "the General Assembly has

---

[1] *See generally* W. Hamilton Bryson, Bryson on Virginia Civil Procedure § 2.02[1][b], at 2-13 to -26 (5th ed. 2017 & Supp. 2021).

[2] *See generally* Memorandum from the Comm. to Study Sovereign Immunity to the

employed an incremental approach by enacting a limited waiver of immunity in the Virginia Tort Claims Act." *AlBritton v. Commonwealth*, 299 Va. 392, 399 (2021) (citation omitted). Claims against localities and their employees, however, continue to be governed by the common-law principles.[3] *See Rector & Visitors of the Univ. of Va. v. Carter*, 267 Va. 242, 244-45 (2004). One of the more difficult principles — the derivative sovereign immunity of a municipal employee — must be examined in the case now before us.

1.

The first step in this analysis is to determine the scope of the governmental entity's immunity. Sovereign immunity protects municipalities from tort liability arising from governmental functions but not proprietary functions. *See City of Chesapeake v. Cunningham*, 268 Va. 624, 634 (2004). A municipality engages in a governmental function when it exercises powers and duties exclusively for the public welfare, effectively acting "as an agency of the state to enable it to better govern that portion of its people residing within its corporate limits." *Hoggard v. City of Richmond*, 172 Va. 145, 147 (1939). "[T]he test applied by the Court . . . is 'whether, in providing such services, the governmental entity is exercising the powers and duties of government conferred by law for the general benefit and well-being of its citizens.'" *Carter v. Chesterfield Cnty. Health Comm'n*, 259 Va. 588, 593 (2000) (citation omitted). "If so, the

---

Boyd-Graves Conf. 1-27 (2005) (on file with the Virginia Bar Association); Memorandum from the Comm. to Study Sovereign Immunity to the Boyd-Graves Conf. 1-35 (2006) (on file with the Virginia Bar Association) [hereinafter 2006 Boyd-Graves Memorandum]; Memorandum from the Sovereign Immunity Comm. to the Boyd-Graves Conf. 1-6 (July 2, 2009), [hereinafter 2009 Boyd-Graves Memorandum], https://cdn.ymaws.com/www.vba.org/resource/resmgr/imported/12.pdf.

[3] *See generally* 2 Charles E. Friend & Kent Sinclair, Friend's Virginia Pleading and Practice § 35.02[2], at 35-47 to 35-77 (3d ed. 2017).

function is governmental and the municipality is immune." *Massenburg v. City of Petersburg*, 298 Va. 212, 218 (2019).

Just as "maintenance of a police force is a governmental function," *Niese v. City of Alexandria*, 264 Va. 230, 240 (2002) (citing *Hoggard*, 172 Va. at 148), operating a jail is also a governmental function, *Short Pump Town Ctr. Cmty. Dev. Auth. v. Hahn*, 262 Va. 733, 743 n.11 (2001); *Richmond v. Bd. of Supervisors*, 199 Va. 679, 680 (1985); *Franklin v. Town of Richlands*, 161 Va. 156, 158, 163 (1933). It necessarily follows that providing constitutionally and statutorily required medical care to inmates at a municipal jail involves the exercise of "powers and duties of government conferred by law" on the municipality, *Carter*, 259 Va. at 593.

The second step in the analysis engages the premise that "government can function only through its servants," and thus, "certain of those servants must enjoy the same immunity in the performance of their discretionary duties as the government enjoys." *First Va. Bank-Colonial v. Baker*, 225 Va. 72, 79 (1983). *See generally* Kent Sinclair & Leigh B. Middleditch, Jr., Virginia Civil Procedure § 2.31, at 186-98 (7th ed. 2020 & Supp. 2021-2022). To determine whether derivative sovereign immunity applies to an employee, we focus on four, non-exclusive factors: "(i) the nature of the function performed by the employee; (ii) the extent of the [governmental employer's] interest and involvement in the function; (iii) the degree of control and direction exercised by the [governmental employer] over the employee; and (iv) whether the act complained of involved the use of judgment and discretion." *Messina v. Burden*, 228 Va. 301, 313 (1984) (citing *James v. Jane*, 221 Va. 43, 53 (1980)).

Because this multi-factor test is broadly worded and capable of disparate applications, we seek safe harbor in a "fine-grained analysis," *Pike*, 292 Va. at 219 n.3, that looks to prior

7

applications involving fact patterns that most closely parallel the case before us. Five such applications exist that frame the present debate and set the boundaries of derivative sovereign immunity involving medical professionals. Each case, like the present one, involved some variation of a misdiagnosis claim of medical malpractice.

The most recent case, *Pike v. Hagaman*, involved a nurse at the Virginia Commonwealth University Medical Center who was found to be protected by derivative sovereign immunity. *See id.* at 219. She provided health care to indigents, an "essential governmental function," *id.* at 217, thus satisfying the first and second factors. She exercised considerable "discretion" in how she performed her medical tasks, thus satisfying the third factor. *See id.* at 218. She could not refuse to treat patients, was supervised by senior nursing staff, was subject to hospital policies, and worked on a schedule determined by her superiors — all circumstances that "point[ed] in the direction" of satisfying the fourth factor. *Id.*

We have also addressed the derivative sovereign immunity of a "physician extender," who was a resident in psychiatry at the University of Virginia and engaged in a post-graduate residency program at a state psychiatric facility. *McCloskey v. Kane*, 268 Va. 685, 688 (2004). The physician extender "was not directly supervised or controlled by anyone" at the psychiatric facility, and "[t]he details of his schedule were not dictated or controlled" by the psychiatric facility. *Id.* Because "the Commonwealth's control over the [physician extender] was, at best, slight," *id.* at 690, we held that he was not entitled to derivative sovereign immunity. Unlike all other cases in this line of precedent, however, Senior Justice Stephenson's opinion for the Court in *McCloskey* focused on only one of the four factors — the extent of government control over the employee. We have never cited or relied upon *McCloskey* for the proposition that its singular analytical focus was applicable outside the unique circumstances of that case.

8

One of the cases that *McCloskey* distinguished in a footnote, *see id.* at 690 n.1, was *Lohr v. Larsen*, which held that a physician employed by a public healthcare clinic (an immune government entity) was protected by derivative sovereign immunity, 246 Va. 81, 88 (1993).[4] *Lohr* examined each of the four factors separately. For the first two factors, *Lohr* held that providing public healthcare was an "essential" government function, and that the physician "was performing a function which was an essential part of the clinic's delivery of its health care services." *Id.* at 86. For the third factor, *Lohr* stated that the physician was making "discretionary medical decisions," as opposed to performing "ministerial" acts at the time of the alleged malpractice. *Id.* at 87.

*Lohr* had much to say about the fourth factor — the extent of the government's control over the employee. Acknowledging that "[a] high level of control weighs in favor of immunity" and the inverse weighs in favor of denying immunity, *Lohr* sought to reconcile what "[a]t first glance" appeared to be a conflict between this factor, employer control, and the third factor, employee discretion. *Id.* at 88. To reconcile the two, *Lohr* held: "[W]hen a government employee is specially trained to make discretionary decisions, the *government's control must necessarily be limited* in order to make maximum use of the employee's special training and subsequent experience." *Id.* (emphasis added). Given the diminished relevance of control in the context of a medical professional, *Lohr* found that the fourth factor was fully satisfied for several reasons. The public-health clinic determined which patients the physician would treat. The physician had no discretion to "decline to accept a particular person as a patient." *Id.* The clinic determined the "equipment" that the physician would use and the "procedures" that he was

[4] Justice Stephenson disagreed with the holding in *Lohr* and dissented based upon his earlier dissent in *Gargiulo v. Ohar*, 239 Va. 209, 215-17 (1990) (Stephenson, J., dissenting). *See Lohr*, 256 Va. at 88-89 (Stephenson, J., dissenting).

authorized to perform.  *Id.*  In the context of medical professionals, *McCloskey* later observed, these facts in *Lohr* demonstrated that the government's control over "the physician was great." *McCloskey*, 268 Va. at 690 n.1 (citing *Lohr*, 246 Va. at 88).

The next case, *Gargiulo v. Ohar*, held that a physician working for an immune state entity, the Medical College of Virginia, was derivatively immune to a medical malpractice claim. 239 Va. 209, 215 (1990).  Addressing the first and second factors, *Gargiulo* held that the physician, a resident participating in a "medical research program," was engaged in an "essential" government function.  *Id.* at 213.  The third factor was easily met because physicians must necessarily "exercise discretion and judgment" when treating patients.  *Id.* at 214. *Gargiulo* found that the fourth factor was satisfied for several reasons, the principal ones being that the physician was not "permitted to choose or to refuse patients" and was "required to obey state-established rules, to employ state-prescribed methods, and to follow state-standardized procedures."  *Id.* at 215.

*Gargiulo* found these circumstances distinguishable from *James v. Jane*, 221 Va. 43 (1980), which addressed an immune entity that had "virtually no control over the professional conduct" of the physician.  *Gargiulo*, 239 Va. at 214.  The patients in *James* "had 'the right to request and receive the care of a particular attending physician' and physicians had 'the privilege to select the patients . . . and [were] under no obligation to accept any individual or class of persons as patients.'"  *Id.* (quoting *James*, 221 Va. at 47).  The financial relationship between the physician and patient in *James* resembled that of a private medical practice.  *James*, 221 Va. at 49.  Patients in *James* received bills "'in the name of the attending physicians' who were 'privileged to compromise their bills or forgive them.'"  *Gargiulo*, 239 Va. at 214 (quoting *James*, 221 Va. at 49).  And "[a] portion of the fees paid to the hospital by private patients was

10

'allocated to a fund used in partial support of the attending physicians' . . . retirement program.'"
*Id.* at 214-15 (quoting *James*, 221 Va. at 48).

Justice Stephenson, the author of *McCloskey*, dissented in *Gargiulo*, as he had in *Lohr*, and argued against the very concept of derivative immunity on public policy grounds: "Granting sovereign immunity to licensed physicians discourages rather than encourages good medical practices. The Commonwealth's primary interest, however, should be to encourage a physician's best efforts on behalf of his patient." *Id.* at 216 (Stephenson, J., dissenting). The derivative, sovereign-immunity test, Justice Stephenson contended, "places too much emphasis on the relationship that existed between [the physician] and the hospital and too little emphasis on the relationship that existed between [the physician] and her patient." *Id.* at 217; *cf. Pike*, 292 Va. at 219-21 (Mims, J., dissenting).

2.

Many legal commentators argue that the very concept of sovereign immunity — a debate that led to the first constitutional crisis of the American republic — continues to remain a debate worth having in modern times.[5] We do not contest this assertion. To be sure, our survey of the alive-and-well doctrine of sovereign immunity in this Commonwealth demonstrates that slight distinctions can sometimes produce discordant results. Even so, this is not a debate for Virginia's courts. We must insist, as did James Madison and John Marshall, that sovereign

---

[5] *See, e.g.*, Colleen F. Shepherd, *Why All the King's Horses and All the King's Men Couldn't Put Sovereign Immunity Back Together Again: An Analysis of the Test Created in* James v. Jane, Rich. J.L. & Pub. Int., Fall 2007/Winter 2008, at 1, 21; 2009 Boyd-Graves Memorandum, *supra* note 2, at 1 ("The remedies currently available to citizens who are injured or damaged by the torts of Virginia local governments are not only confusing, inconsistent, and unpredictable, but are also inherently unfair."); 2006 Boyd-Graves Memorandum, *supra* note 2, at 14 ("Most members of the Committee feel that the present system is 'broken.'").

immunity was indisputably part of the common-law architecture of judicial power.[6]  We have no authority to reset its essential doctrinal boundaries or to replace it with a more adaptive scheme of liability management.  "In Virginia, it would be a violation of the constitution for the *courts* to undertake to supply all defects of the common law not already supplied by statute.  That is the exclusive province of the *legislature.*"  *White v. United States*, 300 Va. 269, 278 (2021) (emphases in original) (quoting 1 St. George Tucker, Blackstone's Commentaries, Editor's App. Note E, at 405 (1803)); *see also Robinson v. Matt Mary Moran, Inc.*, 259 Va. 412, 417-18 (2000).

Turning to the governing line of analogous precedent, beginning with *James* and ending with *Pike*, we agree with the circuit court that Dr. Wang was entitled to the protection of derivative sovereign immunity.  His employer had a constitutional and statutory duty to provide medical care to incarcerated patients.  *See Estelle*, 429 U.S. at 102-04; Code § 53.1-126.  This medical care was not simply a benevolent act of governmental grace.  It was a constitutional requirement backed by a statutory imperative.  In such circumstances, the governmental "interest and involvement," *Pike*, 292 Va. at 215 (citation omitted), is at its apogee.[7]  The City chose Dr. Wang as its agent to fulfill this duty.  There can be little doubt, therefore, that the first two factors of the derivative, sovereign-immunity test have been satisfied.

---

[6] *See Alden*, 527 U.S. at 716-18 (discussing James Madison's and John Marshall's views of sovereign immunity at Virginia's ratifying convention); William Baude, *Sovereign Immunity and the Constitutional Text*, 103 Va. L. Rev. 1, 10 (2017); Andrew G.I. Kilberg, Note, *We the People: The Original Meaning of Popular Sovereignty*, 100 Va. L. Rev. 1061, 1095 (2014).

[7] A state has no constitutional mandate to provide medical care to non-incarcerated indigents or to educate medical professionals.  Yet these laudable governmental interests satisfied the first two prongs of the derivative sovereign immunity test.  *See Pike*, 292 Va. at 216-17, *Lohr*, 246 Va. at 86, and *Gargiulo*, 239 Va. at 213.  All the more does the constitutional obligation in this case satisfy the first two prongs.

As for the third factor — the discretionary or ministerial nature of the function — our cases uniformly emphasize the highly discretionary character of professional medical care. *See id.* at 217-18; *Lohr*, 246 Va. at 86-87; *Lawhorne v. Harlan*, 214 Va. 405, 407-08 (1973), *overruled on other grounds by First Va. Bank-Colonial*, 225 Va. at 78-79. This conclusion is reinforced by the nature of the complaint's malpractice allegations. All of the allegations involve discretionary — not ministerial — medical decisions made by Dr. Wang.

Most of the debate in this case, as was true in *Lohr* and *McCloskey*, centers on the fourth factor — the degree of governmental control over the employee. On this subject, we believe the most apt comparator is *Lohr*, which *McCloskey* agreed had involved a "great" measure of control. *See McCloskey*, 268 Va. at 690 n.1 (citing *Lohr*, 246 Va. at 88). In the present case, the evidence presented at the ore tenus hearing proved:

- Dr. Wang had no control over the patients that he was obligated to treat. The DADC put together the "list of inmates for Dr. Wang to see." J.A. at 110. "He ha[d] no way of tracking it. He [didn't] have access to [DADC] records or anything like that." *Id.* While working for the DADC, he was required to treat DADC inmates and could not refuse to do so.

- Dr. Wang did not bill inmates for his services, nor did the DADC bill inmates in Dr. Wang's name. Dr. Wang received an hourly wage that was not directly calibrated to specific medical procedures administered to specific inmates or "the overall number of inmates at the facility or the number of inmates he dealt with on a particular day or basis." *Id.* at 108.

- Dr. Wang was required to treat the inmates at the DADC facility, using its examination room and only using City-owned medical equipment and supplies.

- Dr. Wang did not possess or control any of the medical records of his patients. These records were kept on-site and under the control of the DADC.

- Any prescription ordered by Dr. Wang had to be filled by the pharmacy that the DADC had contracted with to supply inmate prescription medications.

13

- Dr. Wang was not the sole authority on questions related to his medical treatment of inmates. He was governed by medical policies and procedures promulgated by the Virginia Board of Corrections as well as an additional set of medical policies and procedures mandated by the DADC.

- Though Dr. Wang necessarily exercised his discretionary medical judgment, he was still subject to the direct supervision of the DADC Director, the primary author of the DADC medical guidelines governing Dr. Wang's employment. The DADC Director and Dr. Wang meet approximately 45 times a year to review specific "medical situation[s]." *Id.* at 103.

- Dr. Wang treated only inmates (not DADC employees), and thus every physician-patient encounter had to be reviewed and controlled, if necessary, by DADC security personnel. The DADC security team, not Dr. Wang, made the decisions on what, if any, security precautions should be taken.

Upon hearing these facts ore tenus, the circuit court found by a preponderance of the evidence that Dr. Wang satisfied all four of the legal factors that we traditionally apply to determine if an employee of an immune government entity should be protected by derivative sovereign immunity from claims of simple negligence.[8] Giving the court's conclusion the same weight as we would a jury verdict, *Pike*, 292 Va. at 214, we affirm this holding, finding no error of law or any irrationality in the factfinding of the circuit court.

B.

Allegations of gross negligence can pierce through a derivative sovereign-immunity defense asserted by an otherwise immune government employee. *See Cromartie v. Billings*, 298 Va. 284, 297 (2020); Sinclair & Middleditch, *supra*, at 192. The circuit court held that the

---

[8] A plea in bar asserting sovereign immunity is akin to an affirmative defense with the defendant bearing the burden of proving the facts supporting the defense by a "preponderance of the evidence." *RF & P Corp. v. Little*, 247 Va. 309, 318 (1994); *see Massenburg*, 298 Va. at 216; Kent Sinclair, The Law of Evidence in Virginia § 5-7, at 337 (8th ed. 2018).

allegations in the complaint filed by Patterson's estate do not state a prima facie case of gross

negligence.  We agree.

1.

When reviewing a circuit court order dismissing a claim on demurrer, we accept as true

all factual allegations in the complaint "made with 'sufficient definiteness to enable the court to

find the existence of a legal basis for its judgment.'"  *Squire v. Virginia Hous. Dev. Auth.*, 287

Va. 507, 514 (2014) (citation omitted).  "Two important limitations on this principle, however,

deserve emphasis."  *Doe ex rel. Doe v. Baker*, 299 Va. 628, 641 (2021) (quoting *Coward v.

Wellmont Health Sys.*, 295 Va. 351, 358 (2018)).

> First, while we also accept as true unstated inferences to the extent
> that they are *reasonable*, we give them no weight to the extent that
> they are *unreasonable*.  The difference between the two turns on
> whether "the inferences are strained, forced, or contrary to reason,"
> and thus properly disregarded as "arbitrary inferences."  Second,
> we must distinguish allegations of historical fact from conclusions
> of law.  We assume the former to be true *arguendo*, but we assume
> nothing about the correctness of the latter because "we do not
> accept the veracity of conclusions of law camouflaged as factual
> allegations or inferences."

*Id.* (emphases in original) (quoting *Coward*, 295 Va. at 358-59).  These observations arise from

the traditional "'sufficient definiteness' requirement" that "has long anchored our application of

notice-pleading principles."  *A.H. ex rel. C.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 613

n.1 (2019).

2.

Employing this standard of appellate review in this case, we discount the broadly worded

"conclusions of law," *Doe*, 299 Va. at 641 (citation omitted), in the complaint and focus solely

on factual allegations stated with "sufficient definiteness," *Squire*, 287 Va. at 514.  We then

15

determine whether those allegations and any reasonable inferences therefrom satisfy the legal threshold for proving a prima facie case of gross negligence.

Virginia law defines gross negligence as "a heedless and palpable violation of legal duty respecting the rights of others which amounts to the *absence of slight diligence*, or the *want of even scant care*." *Commonwealth v. Giddens*, 295 Va. 607, 613 (2018) (emphases added) (quoting *Chapman v. City of Virginia Beach*, 252 Va. 186, 190 (1996)). "[A] claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Elliott v. Carter*, 292 Va. 618, 622 (2016).

These definitional principles are not new to Virginia jurisprudence. Our cases frequently recite them. *See Doe*, 299 Va. at 653 (holding that allegations did not rise to the level of gross negligence because "the defendants showed 'some degree of care'" (citation omitted)); *Elliot*, 292 Va. at 622 ("The standard for gross negligence [in Virginia] is one of indifference, not inadequacy."); *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 487 (2004) (explaining that gross negligence "requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness"); *Frazier v. City of Norfolk*, 234 Va. 388, 393 (1987) ("'Gross negligence' is that degree of negligence which shows an utter disregard of prudence amounting to complete neglect of the safety of another."). *See generally* Sinclair & Middleditch, *supra*, § 2.31, at 192 (discussing gross-negligence standard in the context of a qualifiedly immune governmental employee).

3.

The complaint in this case alleges that Dr. Wang was grossly negligent by failing to properly diagnose and treat Patterson. The complaint, however, provides a long list of medical tests and treatments that Patterson received, beginning with Dr. Wang's examination of Patterson

16

on November 10, six days after Patterson arrived at the DADC. Dr. Wang prescribed medication for Patterson's high blood pressure and ordered a comprehensive metabolic panel and complete blood count. When the blood tests were reviewed, they showed that Patterson's sodium levels were five points below the normal range. On November 11, the DADC transported Patterson to a local hospital where he received a battery of tests and treatments. The hospital physicians discharged Patterson a day later after his "hyponatremia had resolved." J.A. at 7. Four days later, Dr. Wang examined Patterson and ordered that he be given several medications (Zantac, Ibuprofen, and Atenolol) for symptoms he was then experiencing.

Dr. Wang examined Patterson again on December 5 with symptoms of "altered mental status." *Id.* at 8. Dr. Wang diagnosed Patterson as psychotic and prescribed Haldol, an anti-psychotic medicine. Dr. Wang also examined Patterson on December 23, 2016; February 1, 2017; and February 15, 2017. Dr. Wang prescribed various medications (Cogentin, Benztropine, Amlodipine, Haldol, Atenolol, Humalog, and Nortriptyline), but he did not prescribe any medication for hyponatremia.

Relying upon these allegations, the complaint claims that Dr. Wang misdiagnosed Patterson and should have found, using "differential diagnosis" techniques, that Patterson was suffering from a reoccurrence of hyponatremia and treated him for it. *Id.* at 10. This alleged misdiagnosis, the complaint concludes, was not just negligent but grossly negligent. We disagree. Taken at face value, these allegations do not show a "heedless and palpable violation of legal duty" by a physician who refused to show even "slight diligence" or "scant care," *Giddens*, 295 Va. at 613 (citation omitted), for his patient's medical needs. Dr. Wang's multiple efforts to treat Patterson — whether or not negligently performed — demonstrate that Dr. Wang was exercising "some degree of care" in his capacity as a physician, and thus, the "claim for

17

gross negligence must fail as a matter of law," *Elliott*, 292 Va. at 622. To conclude otherwise would convert most, if not all, allegations of misdiagnosis in medical malpractice cases into claims of gross negligence. The circuit court, therefore, did not err in granting Dr. Wang's demurrer to this count of the complaint.

III.

In sum, the circuit court did not err in concluding that Dr. Wang was entitled to the protection of derivative sovereign immunity and that the allegations of gross negligence were insufficient as a matter of law. We thus affirm.

*Affirmed.*